AO 243 (Rev. 01/15)                                                                                          Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court Middle | District of Georgia (Albany) |
|---|---|

| Name *(under which you were convicted)*: Christopher Whitman | Docket or Case No.: |
|---|---|

| Place of Confinement: FCC Coleman Low, Coleman, Florida | Prisoner No.: 97202-020 |
|---|---|

| UNITED STATES OF AMERICA | v. | Movant *(include name under which convicted)* Christopher Whitman |
|---|---|---|

## MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:
   United States District Court
   Middle District of Georgia (Albany)

   (b) Criminal docket or case number (if you know):  1:14-cr-00001-WLS-TQL-1

2. (a) Date of the judgment of conviction (if you know):  March 3, 2015

   (b) Date of sentencing  September 15, 2015

3. Length of sentence:  264 months

4. Nature of crime (all counts):  Violation of 18 U.S.C. §§§ 1343, 1346, 201(b)(1), and §§§§ 641, 1512(c), 1519, and 2. These counts consider of the following: Scheme to deprive the U.S. of money, property, and honest services by wire fraud; bribery; theft of government property; obstruction of an official proceeding; destruction of records in federal investigation.

5. (a) What was your plea? (Check one)
   (1) Not guilty [x]      (2) Guilty [ ]      (3) Nolo contendere (no contest) [ ]

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have? (Check one)   Jury [x]   Judge only [ ]

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes [ ]   No [x]

8. Did you appeal from the judgment of conviction?   Yes [x]   No [ ]

9.  If you did appeal, answer the following:

   (a) Name of court:  Eleventh Circuit Court of Appeals

   (b) Docket or case number (if you know):  15-14846

   (c) Result:  Affirmed

   (d) Date of result (if you know):  April 24, 2018

   (e) Citation to the case (if you know):

   (f) Grounds raised:
    Challenged sentence enhancements and not his conviction.

   (g) Did you file a petition for certiorari in the United States Supreme Court?   Yes [ x ]      No [  ]

    If "Yes," answer the following:

    (1) Docket or case number (if you know):  18-7440

    (2) Result:    denied

    (3) Date of result (if you know):  February 25, 2019

    (4) Citation to the case (if you know):

    (5) Grounds raised:
      Whether the district court was obligated to permit self-respresentation and the district court applied Amendment 792 retroactively.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
   Yes [ x ]   No [  ]

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court:   United States District Court

    (2) Docket or case number (if you know):  1:18-cv-00056OWLS-TQL

    (3) Date of filing (if you know):  March 14, 2018

    (4) Nature of the proceeding:  Writ of Mandamus

    (5) Grounds raised:  Whether the Clerk of the Court should have docketed a pro se Rule 33 motion.

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐       No ☒

(7)  Result:   denied

(8)  Date of result (if you know):   April 18, 2018

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court:

(2)  Docket of case number (if you know):

(3)  Date of filing (if you know):

(4)  Nature of the proceeding:

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐       No ☐

(7)  Result:

(8)  Date of result (if you know):

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:        Yes ☒       No ☐       18-11700-J

(2)  Second petition:      Yes ☐       No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

AO 243 (Rev. 01/15)                                                                                    Page 5

**GROUND ONE:** Trial counsel's actual conflicts of interest denied Mr. Whitman's

his Sixth Amendment guarantee of the effective assistance of counsel.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support **your claim.**):

(b) **Direct Appeal of Ground One:**

   (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

   (2)  If you did not raise this issue in your direct appeal, explain why:

        Issue was not ripe for review

(c) **Post-Conviction Proceedings:**

   (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☐

   (2)  If you answer to Question (c)(1) is "Yes," state:

   Type of motion or petition:

   Name and location of the court where the motion or petition was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

   (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

   (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

   (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

AO 243 (Rev. 01/15)                                                                                           Page 6

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know):   _____

Date of the court's decision:   _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue:

_____

**GROUND TWO:**  Trial counsel's indiligent preparation resulted in a belated discovery,
thereby constructively denying Mr. Whitman the effective assistance of constitutionally
guarantee counsel.

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☒

(2)   If you did not raise this issue in your direct appeal, explain why:

Issue was not ripe for review.

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐        No ☐

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐     No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐     No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐     No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND THREE:**   At sentencing and on appeal, defense counsel overlooked that the district court failed to comply with U.S.S.G 1B1.3 when determining relevant conduct. Defense counsel's oversight resulted in the effective denial of counsel.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

AO 243 (Rev. 01/15)                                                                                      Page 8

**(b) Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐     No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

          Issue was not ripe for review.

**(c) Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

          Yes ☐     No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed:

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

    _____

    (3)  Did you receive a hearing on your motion, petition, or application?

          Yes ☐     No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

          Yes ☐     No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

          Yes ☐     No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you **did not** appeal or raise this issue:

---

**GROUND FOUR:**        The Constitution guarantees a criminal defendant the right to trial by an impartial jury. A member of Mr. Whithman's jury was bribed, thereby depriving him of his constitutional right to a jury trial.

---

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

---

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes [   ]        No [ x ]

(2)   If you did not raise this issue in your direct appeal, explain why:

Issue not ripe for review.

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes [   ]        No [   ]

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

AO 243 (Rev. 01/15)                                                                                      Page 10

(3)   Did you receive a hearing on your motion, petition, or application?

     Yes ☐     No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

     Yes ☐     No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

     Yes ☐     No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14.   Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?    Yes ☒    No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

```
United States Court of Appeals for the Eleventh Circuit
Appeal No.: 18-11700-J
Petition for Writ of Manadamus from the denial of the
district court's order denying mandamus from the filing of
Mr. Whitman's pro se Rule 33 motion, based on the district court
Clerk's office returning the Rule 33 unfiled. Hence precluding
him from a timely filing of the Rule 33.
```

AO 243 (Rev. 01/15)                                                                                                          Page 11

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the
     you are challenging:

     (a)  At the preliminary hearing:                     Thomas Esum

      Garland, Samuel, & Loeb, PC; 3151 Maple Drive, NE; Atlanta, Georgia 30305

     (b)  At the arraignment and plea:

      same as above

     (c)  At the trial:

      same as above

     (d)  At sentencing:

      same as above

     (e)  On appeal:

      same as above

     (f)  In any post-conviction proceeding:



     (g)  On appeal from any ruling against you in a post-conviction proceeding:



16.  Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court
     and at the same time?         Yes [  ]        No [ x ]

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are
     challenging?         Yes [  ]        No [ x ]

     (a)  If so, give name and location of court that imposed the other sentence you will serve in the future:



     (b)  Give the date the other sentence was imposed: _____

     (c)  Give the length of the other sentence: _____

     (d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or
     sentence to be served in the future?         Yes [  ]        No [  ]

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain
     why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

          This motion is timely pursuant to (f)(1). The date on which the Writ of
     Certiorari was denied is February 25, 2019.

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1)   the date on which the judgment of conviction became final;

(2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 01/15)                                                                                         Page 13

Therefore, movant asks that the Court grant the following relief:

_____ Vacate Conviction _____

or any other relief to which movant may be entitled.


_____
Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ 10/17/2019 _____.

(month, date, year)


Executed (signed) on _____ 10/17/2019 _____   (date)

_____
Signature of Movant


If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

**Ground One:**   Trial counsel's actual conflict of interest denied Mr. Whitman the Sixth Amendment's guarantee of the effective assistance of counsel.

**Supporting Facts:** [1]

### Facts Common to All Claims

Mr. Whitman engaged Ed Garland, Esquire, to assist with a grand jury invstigation, and, if necessary, to defend Mr. Whitman against any federal charges. As the criminal investigation developed, Mr. Garland advised Mr. Whitman to take several actions. Some of these actions resulted in actual conflicts of interest between Mr. Garland and Mr. Whitman. Put differently, by following Mr. Garland's advice Mr. Whitman generated several actual conflicts of interest between himself and his attorneys.

For example, Mr. Garland recognized that the prospective fraud charges might include violations of the federal tax law. In light of the peculiarities associated with the tax law, Mr. Garland referred Mr. Whitman to the law firm of Thompson and Singer. As instructed Mr. Whitman retained the firm.

Shortly thereafter, Mr. Garland also referred the government's key witness (Kelli Durham) to Thompson and Singer. Mr. Whitman paid a $100,000 fee to Thompson and Singer to represent Ms. Durham. Thompson and Singer took the engagement even though they still represented Mr. Whitman on the related criminal tax matters.

Another example, Robert Margeson, Esquire, also one of Mr. Whitman's attorneys, received $725,000 in funds to be held in escrow for Chris and Becky Whitman. Minutes before the criminal trial commenced, Mr. Margeson

---

[1]    Mr. Whitman divides the facts supporting this ground into three separate claims. These claims both separately and combined demonstrate the constitutional error (denial of counsel) entitling Mr. Whitman to vacate the criminal judgment.

1

told Mr. Whitman the funds had been used to prepare for trial and develop the criminal defense. But Mr. Margeson served only as Mr. Garland's (referring) co-counsel and the more than two million dollars paid to Mr. Garland's firm was suppose to cover all trial costs. Mr. Margeson told Mr. Whitman that the Garland firm had not "taken care of him" so he had to use the escrowed monies. Mr. Margeson and his associate participated in the criminal defense throughout trial, sentencing, and forfeiture, in order to ensure the escrow was not forfeited nor returned to either Mr. or Mrs. Whitman or both.

Neither least nor last, Mr. Garland learned that a juror had been bribed, instead of bringing the matter to the court's attention in order to obtain a mistrial, Mr. Garland kept silent because he knew that Mr. Whitman had no funds to pay for another trial, and Mr. Garland had another paying client to attend to. Hence, he could not spend the time on another Whitman trial. In other words, Mr. Garland based his legal decision (strategy) on his personal (financial) interests rather than what was in Mr. Whitman's best interest.

Mr. Whitman gathers his supporting facts into distinct claims, any one of which demonstrates that a conflict of interest denied Mr. Whitman the assistance of counsel. Of course, together the overlapping claims equate to a total deprivation of counsel.

2

**Claim 1.1**  Defense counsel had financial conflicts of interest that affected the defense's strategy and tactics.

Mr. Garland's colleagues and friends had received millions of dollars in fees and commercial gains from Mr. Whitman. All of which were subject to forfeiture or disgorgement. In order to ensure that these millions of dollars did not have to be repatriated, Mr. Garland had to convince Mr. Whitman to plead guilty. Mr. Whitman's guilty plea would whitewash several conflicts of interest and cover several financial transactions that might otherwise have adverse consequences for counsel. Summarily, Mr. Garland's financial interests required that Mr. Whitman plead guilty.

Thereafter, Mr. Garland promoted, encouraged, and prodded Mr. Whitman to take a guilty plea. Then either the court or the government set a deadline for Mr. Whitman's guilty-plea decision. On the day Mr. Whitman's answer was due, Mr. Whitman turned off his telephone, and went by himself on to his property to pray. The result of that reflection: God told Mr. Whitman to go to trial.

Mr. Garland hit the proverbial roof. In one of a number of heated calls, Mr. Garland told Mr. Whitman, sometimes you "just can't listen to God." Mr. Whitman, however, chose to follow Abraham's path and obey God. For Mr. Garland this turned into an unmitigated disaster.

Mr. Whitman's surprise decision to proceed to trial illuminated Mr. Garland's indiligent trial preparation, despite the millions in fees, Mr. Garland had not properly prepared for trial. Mr. Garland had to scramble to get ready. This last minute effort explains why he only belatedly recognized that the offense conduct (Mr. Whitman's transactions) was more in the nature of a gratuity than a bribe. Mr. Garland also overlooked that the government

3

employees (like Mitch Potts, Michelle Rodriguez) initiated the scheme, not
Mr. Whitman. Not to mention, Mr. Garland overlooked the flipside of the
economic-duress strategy, that is, that the gratuity-practice was normal
for the community Marine Corp. Logistics Base, and the Defense Logistic
Agency. Put differently, the offense conduct gratuities were within the
communities' sense of honest dealing and fair play. Which meant that Mr.
Whitman's conduct was not a scheme to defraud. Mr. Garland's indiligence
caused him to overlook viable defenses of community standards, estoppel,
sentence aggravation, et cetera. From the outset, Mr. Garland misjudged
his own persuasive powers; he believed he could convince Mr. Whitman to
plead guilty. That non-strategic decision resulted in objectively inadequate
preparation. Of course, the danger of substantial financial losses and the
potential for reputational damage from a trial amplified Mr. Garland's
conflict and his related deficiant performance.

Without a doubt, when Mr. Whitman refused to plead guilty Mr. Garland
was shocked. But that shock cannot be attributed to good lawyering rather
the result of an ineffective attorney.

**Claim 1.2** Defense counsel represented other clients whose interest were
adverse to Mr. Whitman's including the government's principle
witness, Kelli Durham.

By proceeding to trial, Mr. Whitman unveiled the blazing conflict caused
by Mr. Whitman's attorneys Ron Thompson's partner (Janice Singer) representing
the government's key witness, Kelli Durham. When Ms. Durham became a target
of the investigation, Mr. Garland said she needed counsel—Mr. Garland
advised that the perfect attorney for Ms. Durham was Janice Singer-Capek.

4

Ms. Singer's firm (Ron Thompson and Janice Singer) was already representing Mr. Whitman on the tax matters related to the alleged crime, thus was familiar with the facts and the legal strategies.

Both Mr. Thompson and Ms. Singer had participated in numerous discussions with Mr. Whitman including several extended discussions with other attorneys: Mr. Garland, his partners, Mr. Margeson and his associate Leigh Ann Flynn. Essentially, in order to ensure proper treatment of the taxes, Mr. Whitman had disclosed all the facts to Thompson/Singer. Furthermore, he disclosed the advice (both confidential and privileged) of his other attorneys, thus Ms. Singer had full knowledge of Mr. Whitman's strategy.

Almost immediately after Mr. Whitman retained Ms. Singer to serve as Ms. Durham's attorney, Ms. Singer advised Ms. Durham to testify against Mr. Whitman. Ms. Singer, building on her knowledge derived from discussions with Mr. Whitman and the other Whitman attorneys, advised Ms. Durham to turn state's evidence and testify against Mr. Whitman. Ms. Durham followed the advice both proffering and testifying against Whitman. Despicably, all the while, Mr. Thompson (Ms. Singer's partner) was Mr. Whitman's attorney and for that matter remains (as far as Mr. Whitman knows) his attorney to this day on the tax matter. Mr. Whitman spent hundreds of thousands of dollars and revealed innumerable confidences to the attorneys who turned out to be helping the prosecutors. The conflict's inception is insidious.

### Conflict Encloaks Garland

Revisiting the facts, it is obvious that Mr. Garland also had a conflict of interest. Undoubtably, Mr. Garland had Ms. Singer take the Durham case in order for (his friend) Ms. Singer to bank a $100,000-plus fee that would require little work. To be sure, Mr. Garland felt that Ms. Singer's loyalty to Mr. Garland would prevent Ms. Durham from precipitously disclosing the unusual financial opportunities Mr. Whitman provided to Mr. Garland, his colleagues, and their clients. Plus, with Ms. Singer in control of Ms. Durham (to Ms. Singer's credit, this part of the plan failed), Mr. Garland believed that he had a measure of control over what Ms. Durham said.

For "Whitman's ears only" Mr. Garland said, it was best to keep Kelli in house "so we could control her." Garland offered one of his many mantras, "United we stand, divided we fall." Garland and Singer set the fee to represent Ms. Durham at $130,000. Mr. Whitman sent Ms. Singer $100,000 on Mr. Garland's advice and over the objection of Mr. Whitman's wife, who could not understand why Whitman would pay $100,000 to assist someone who could "turn on him."

After tucking the 100 grand away, and after her firm received several hundred thousand for the tax and criminal matters, Ms. Singer told Mr. Whitman not to pay the $30,000 balance—because Ms. Durham would be making a deal with the government. Obviously, Ms. Singer adopted the strategy that she thought best for Ms. Durham rather than best for Mr. Garland or Mr. Whitman, but what she overlooked, as Mr. Garland's co-counsel, was that she owed Mr. Whitman an unwaiveable duty. Ms. Singer's advice to Ms. Durham harmed Mr. Whitman. And Mr. Garland's advice to the witness to hire Ms. Singer had created the disastrous

6

conflict in the first place. Mr. Garland, Ms. Singer, and their partners
had actual conflicts of interest that affected the advice they gave to
Mr. Whitman.

**Claim 1.3**   In order to keep from conducting another trial, defense counsel
failed to raise a meritorious claim that a member of the jury
had been bribed.

When Keesha Lawann Hays was selected as a member of the trial jury, she
and her paramour (Mike Cooper) concocted a scheme to take advantage of that
selection. She knew that Mr. Whitman had been accused of bribery and that
the Marine Corps community had a lax attitude toward payments for services
as long as they were ad hoc and discreet. So she had her boyfriend, Mr. Cooper,
contact Brian Whitman. Mr. Cooper had some business dealings with Brian Whitman,
Mr. Whitman's brother.

Ms. Hays and Mr. Cooper decided that by Ms. Hays ensuring that Chris
Whitman did not spend any time in prison, they could get $20,000 and some
favors from the Whitmans. (A view confirmed by Mr. Whitman's dry cleaner who
said they heard that "even if Chris was convicted" the jurors believed Mr.
Whitman, he, would receive probation or home confinement).

Mr. Cooper contacted Brian Whitman and they agreed to the deal. In order
to cement the agreement, Brian paid Mr. Cooper $500. Then, Ms. Hays stared (for
a long time) at a portrait of Judge Sands hanging in the courtroom—an action
that signaled her agreement to the bribery scheme.

6

**Ground Two:**   Without disclosure to or agreement from Mr. Whitman, defense
counsel planned for Mr. Whitman to plead guilty. When Mr. Whitman
chose to proceed to trial, the inadequately prepared defense
attorney constructively denied Mr. Whitman the assistance of
counsel.

**Supporting Facts:**

Months prior to trial, Mr. Whitman explained to Mr. Garland the essential
events leading to the charges. In particular, Mr. Whitman explained that it
was the government employees (particularly Mitch Potts) that broached the idea
of the trucking scheme (last minute loads, specific equipment, etc). Further,
Mr. Whitman explained that the current culture of Albany Marine Corps Logistics
Base and the Defense Logistic Agency involved "showing your appreciation" for
the workers helping you get business. He emphasized there was no formal quid
pro quo arrangement. Significantly,

1.  Often the payments were in food or with low-dollar gift cards. A $25.00
    gift card to TGI Friday's rings of a tip rather than a bribe, especially
    for a contract worth tens of thousands of dollars.

2.  Helping a longtime friend get his car fixed sounds like a good deed even
    if also promoted his business.

3.  The trial record is replete with examples of penny-ante in-kind payments
    that functionally are tips for good services.

Despite the wealth of information and Mr. Whitman's insistence on trial,
defense counsel did not examine alternative defense theories. Counsel neither
investigated the facts nor researched the law; counsel fixated on a different
strategy. Counsel advised Mr. Whitman to transfer or liquidate as many assets
as possible to minimize what is available for forfeiture. [At one point, Mr.
Garland offered to purchase Mr. Whitman's rental properties at a discount in
order to shelter the assets]. The next stage in the strategy: kick, scream,

7

and drag-your-feet as long as possible in hopes of a break, but counsel was thinking (as counsel's latter behavior showed) at the last moment plead guilty.

Counsel collected a multi-million dollar fee but never investigated alternative defenses such as that the alleged misconduct amounted only to the lesser offense of illegal gratuity, or that the government's own agents' behavior equates to intent-numbing estoppel, or that, under this circuit's governing authority there was no scheme to defraud, since Mr. Whitman's actions were within what that business community considered "honest dealing" and "fair play." In other words, counsel's primary strategy was "show me the money," drag and delay, then "hope for the best." Counsel guessed wrong; he thought his client was guilty and would eventually plea. Thus counsel should get as much money (value) as he can for himself and his own (colleagues) then he would get the client to plead guilty. Undoubtably, counsel salved his conscience by thinking "Whitman's dead anyway, better I get the money than the government."

Once at trial, Mr. Garland suddenly realized that the facts demonstrated that an illegal gratuity sceme (i.e., a post hoc reward for favorable treatment) rather than an artifice to defraud through a kickback (quid pro quo decided ex ante), was at work here. Counsel's belated recognition reveals his inadequate investigation. Had he properly investigated the facts and sufficiently researched the law, then he should have identified the defenses before the trial and certainly before the jury charge.

8

**Ground Four:**     A member of the trial jury accepted a bribe. While the jury was
deliberating, defense counsel learned of the bribery scheme but
did not present the misconduct to the court. Counsel's behavior
constitute cause for Mr. Whitman not raising the bribery claim
earlier. The presence of the bribed juror is per se prejudicial
and requires a new trial.

## Supporting Facts:

Keesha Hays was selected as a member of the petite jury. Once selected,
Ms. Hays in concert with her boyfriend Mike Cooper, contacted Chris Whitman's
brother Brian Whitman in order to make an offer. Ms. Hays proposed that in
exchange for $20,000 and some favorable business treatment for Mr. Cooper,
she would ensure that Chris Whitman received no jail time.

In order to cement the deal, Brian would give Mike $500 (which Brian did)
and then Ms. Hays would signal her acceptance by staring longer than normal at
Judge Sands's portrait hanging in the courtroom, which she did. The bribery
scheme continued throughout the trial.

Once the jury entered deliberations, Brian told Chris Whitman about the
bribery scheme in order that Chris did not double pay and also to see if Chris
could help with the $20,000.

Chris refused to pay anything and contacted Mr. Garland to reveal the
scheme. Chris met with Mr. Garland and his associate Matthew Daley at the
Hilton Garden Inn. After whispering to Mr. Garland what this issue was about,
despite that it was raining, Mr. Garland told Chris they needed to take a
walk. Mr. Garland put his jacket on, took Chris outside the hotel. There Mr.
Garland told Chris that he needed to "not mention the bribed jury to anyone."

**10**

Chris Whitman followed counsel's advice for more than two years until he learned, in a prison legal research class, that he and his attorney had a duty to disclose to the court any fundamental flaw in the trial that cast doubt either on the integrity of the proceedings or on the reliability of the verdict.

Once learning of his duty, Chris made several attempts to discuss the issue with Mr. Garland or anyone at Mr. Garland's law firm—no one responded. After many months, Chris took matters into his own "pro se" hands and flailed about trying to have either this court or the appellate court or both take notice of the bribery scheme. But no court seemed to care.

Nonetheless, Mr. Whitman persists in raising the challenge, everything he learned about the Constitution and the justice system indicates that a person is guaranteed an impartial jury.

Finally, to the extent Mr. Whitman's earlier flailing and filing does not constitute a timely objection or does nor properly perfect the bribed-jury-claim, then this court should excuse any procedural default because Mr. Whitman promptly brought the matter to his attorney's attention and only his attorney's misbegotten advice prevented Chris from raising the claim earlier. This court should vacate the conviction and allow Mr. Whitman a new trial.

**Ground Five:**   Defense counsel performed deficiently on direct appeal.

**Supporting Facts:**

Appellate counsel did not disclose that a member of the petite jury had been bribed. Counsel's silence breached his duties to both court and client. Counsel placed his personal interests above those of his client. In Claim 1.3, Whitman addressed the substantive conflict-of-interest claim. Here he only

**11**

repeats the conflicted events for the purpose of establishing cause to excuse his failure to raise the core bribery claim on direct appeal or via Rule 33 motion.

In order to avoid redundancy, Mr. Whitman incorporates the facts of Claim 1.3 and Ground Four into this ground by reference. Succinctly, without Mr. Whitman's knowledge, Keesha Hays agreed to keep Mr. Whitman out of prison for $20,000 plus perks.

Her partner Mr. Cooper met with Mr. Whitman's brother, who sealed the deal with a $500 dollar advance; Ms. Hays confirmed her agreement by staring at a portrait hanging in the courtroom.

After the trial ended, and while the jury was deliberating, Mr. Whitman learned of the bribery scheme. He told his attorney of the bribery scheme. His attorney told Mr. Whitman to never mention it again. Unsurprisingly, the jilted juror did not keep her word. The jury found Mr. Whitman guilty.

The crux of the twisted tale, however, is that Mr. Whitman did not have an impartial jury. Counsel knew it, but did not raise it either in a post-verdict motion or on direct appeal.

The Constitution does not permit the government to deprive a person of their liberty without a trial by an impartial jury. Mr. Whitman's jury was partial. The bribed juror and the defective-jury claim should have been raised by appellate counsel in the direct-appeal stage. Whether under Rule 35(a), or Rule 33, or in the initial appellate brief or all three. Appellate counsel performed inadequately by forfeiting certain claims.

This court should vacate the criminal judgment and restore Mr. Whitman to the status quo prior to trial; but minimally this court should return Mr. Whitman to the direct appeal stage so he may initiate a pre-appeal motion under Rule 33.

**Ground Six:** The federal courts violated Mr. Whitman's due process and access to the court rights when they refused to allow Mr. Whitman to proceed pro se in pursuing a Rule 33 motion and forced Mr. Whitman to proceed with counsel.

## Supporting Facts:

After Mr. Whitman learned that the presence of a bribed juror on a jury not only rendered the trial fundamentally defective, but also should be brought to the court's attention, Mr. Whitman realized that Mr. Garland's advice to remain silent and never mention it was wrong.

In the conspiracy-theory breeding ground of federal prisons, many theories were expressed as to why Mr. Garland would have rendered such advice: sandbagging for Mr. Whitman, covering for another client, assisting the government, etc. The theory that has the best "feel", however, is that Mr. Garland knew this revelation would cause a mistrial. And that would result in a new trial—one Mr. Garland and the other attorneys would have to conduct for free.

We emphasize that in the light of the multimillion dollar fee already paid, and the looming financial obligations (forfeiture and restitution) this court would conclude that counsel needed no more compensation for the encore trial.

Furthermore, at a slightly lower level of concern, a new trial created a renewed risk that the trial would reveal the "iffy" financial transactions with attorneys Margeson, Thompson, Peeler, and Garland, or their clients. Mr. Garland, having walked the tightrope over the mud pit, was not interested in a second trip (a second trial) with its attendant dangers to he and his colleagues' reputations and finances.

13

Unfortunately, when Mr. Whitman wised up and manned up enough to do the right thing, this court (and to a lesser degree, the appellate court) chose to follow a less aspirational path and, through machinations of the rules, deny Mr. Whitman an opportunity to be heard on either the bribery-scheme claim or the conflicted-attorney claim.

**Claim 6.1**

The Constitution requires the government to ensure that a criminal-case defendant receives the effective assistance of counsel at every critical stage in the proceedings. This circuit has not explicitly determined when a Rule 33 motion transfers from a critical stage in the criminal proceedings to a collateral challenge. The federal circuits are divided on the answer, thus this court must make a threshold legal determination of whether a post-notice-of-appeal Rule 33 motion should be treated as a critical stage for Sixth Amendment purposes.

If so, then this court's refusal to remove conflicted counsel or permit Mr. Whitman to represent himself constitutes error under **United States v. Cronic**, 466 U.S. 668 (1984). Correspondingly, efficiency would suggest this court grant the § 2255 motion and vacate the criminal judgment, since denial of counsel at a critical stage requires vacatur regardless of prejudice.

On the other hand, if the post-notice-of-appeal Rule 33 proceedings are not a critical stage, but instead a collateral action, then this court erred in finding that Mr. Whitman had counsel, thereby denying Mr. Whitman the right to proceed pro se. United States statute 28 U.S.C. § 1654 gives every person the right to self-representation. The denial of a statutory right to self-

**14**

representation, also, constitutes an error not subject to a harmlessness inquiry. In this scenario, Mr. Whitman should receive the right to a Rule 33 under the same standards as if the filing were timely (equitably tolling the limitation-period deadline) and to proceed pro se in that action.

In sum, this court denied Mr. Whitman due process, completely foreclosing his right to be heard on fundamental flaws within the trial: constructive denial of counsel through conflict of interest, and denial of an impartial jury as a result of a bribery. The complete denial of due process renders this court's judgment void; the only question is: which is the best path back to a new trial—directly or through a virtually preordained new Rule 33 motion.

This court should vacate the criminal judgment and schedule Mr. Whitman for a new and fair trial.

## Claim 6.2 - Conflicted Counsel

Both this court and the court of appeals transgressed the Sixth Amendment when each forced Mr. Whitman to proceed with conflicted counsel. Prior to oral arguments, Mr. Whitman brought to this court's attention and to that of the court of appeals that significant conflicts of interest existed between counsel and Mr. Whitman. Importantly, some of the conflicts permeated the proceedings and all arose during critical stages of the criminal case.

The threshold and core of this claim are the same; this court and its reviewing court required Mr. Whitman to proceed with conflicted counsel— constructively denying Mr. Whitman of one of the Constitution's most fundamental guarantees. Precedent and the Constitution require vacatur of the conviction.

15

For completeness sake, we point out that Mr. Whitman was willing to represent himself both on direct appeal and in this court, thus conserving judicial resources. Correspondingly, financial concerns could not justify his deprivation of the right to choose counsel.

Also, the appeals court has specific provisions to permit it to proceed with uni-party oral arguments, thus the appeals court cannot fairly justify its decision to require conflicted counsel on such short notice.

This court should vacate the conviction and permit either a new trial or a new direct-appeal stage untainted by conflicted counsel.