**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER WHITMAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Criminal Case No.** |
| **v.** | ) | **1:14-CR-1-1 (WLS)** |
| | ) | |
| | ) | **28 U.S.C. § 2255 Case No.** |
| **UNITED STATES OF AMERICA,** | ) | **1:19-CV-183 (WLS)** |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO VACATE
HIS CONVICTION PURSUANT TO 28 U.S.C. § 2255**

Over the span of approximately four years beginning in 2008, Christopher Whitman concocted a scheme to defraud the United States of approximately $20 million. He did so by bribing several employees of the Marine Corps Logistics Base (MCLB) in Albany, Georgia, to steer lucrative trucking contracts to his small trucking company, United Industrial of Georgia, Inc., also known as United Logistics (ULOC). Whitman then overbilled the government and shortchanged the truckers whom he hired to move the loads to destination. Whitman also concocted a scheme to steal more than 30 large pieces of construction equipment, worth more than a million dollars, from the MCLB and paid bribes to two other base employees who assisted him in that scheme.

In 2014, Whitman, along with two former base employees, were indicted on various charges including bribery, honest services wire fraud, theft and obstruction. After a six-week trial, Whitman was convicted on all counts and sentenced to 264 months of imprisonment and restitution of almost $19 million. Whitman now seeks to vacate his conviction, alleging, among other things,

that his counsel, Edward T. M. Garland of Garland, Samuel & Loeb, P.C., was constitutionally ineffective due to conflicts of interest, that he lacked diligence in preparing Whitman's defense, and that he failed to object to an alleged sentencing error. Whitman further asserts that he did not receive a fair trial, claiming that a juror was bribed, albeit in his favor. Finally, Whitman claims that he was denied due process and access to the courts when he was prevented from filing a Rule 33 motion.

All of Whitman's claims are without merit. Whitman has failed to demonstrate that his defense counsel's performance was constitutionally deficient—outside the wide range of reasonable professional assistance—and that he was prejudiced by counsel's alleged deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Whitman's motion should be denied without a hearing.

## I. Factual & Procedural Background

Prior to indictment, the government provided defense counsel, Edward Garland, and one of his partners with a reverse proffer detailing its theory of the prosecution and the evidence in support thereof. Based on the proffer, defense counsel requested that the government give the presentation a second time—this time with Whitman present. Subsequently, the parties engaged in extensive plea discussions, which ultimately led to the government offering to let Whitman plead guilty to a single count of bribery. Whitman was then given a deadline by which to accept the government's plea offer. As Whitman now admits, his attorney advised him to take the plea offer given the substantial evidence of Whitman's guilt amassed by the government. Whitman rejected the advice of his legal counsel, declined the government's plea offer and proceeded to trial, where he was convicted on all counts, including 43 counts of honest services wire fraud, four

counts of bribery, one count of theft of government property, four counts of obstruction, and one count of destruction of records.

As alleged and summarized in the first superseding indictment, Whitman concocted the transportation and theft schemes at the MCLB, which he carried out from 2008 to 2012. Dkt. 75. The evidence at trial established—and the verdict verifies that the jury had no trouble concluding—that Whitman himself conceived of the schemes and paid more than $1 million in cash, collector items, housing payments, automobiles, and other things of value to MCLB officials to execute them.  The evidence also established that Whitman labored relentlessly to conceal his schemes by falsifying government documents, structuring financial transactions, forging checks, threatening those who questioned his practices, attempting to start a second brokerage as a shell, disguising bribes as transportation costs and business loans, lying to anyone who asked about his business, burning boxes full of documents, and encouraging his co-conspirators to delete text messages and lie to law enforcement.

This corruption and fraud catapulted Whitman's company, ULOC, from a company with less than $20 and a few truck trailers in June 2008, to the number one transportation provider at MCLB barely a year later.  Whitman's corruption and fraud generated more than $37 million in government billings in less than four years, leading others to believe that ULOC was a large trucking company with substantial assets, not the modest Albany truck yard with a small trailer for an office that it actually was.  Whitman himself benefited enormously from his crimes, acquiring 98 real estate parcels worth more than $11 million, in addition to enjoying luxury vehicles, gold, and expensive meals.

Whitman appealed his conviction to the Eleventh Circuit, which affirmed.  *United States v. Whitman*, 887 F.3d 1240, 1243 (11th Cir. 2018).  He then filed a petition for a writ of certiorari

in the Supreme Court, which denied his petition on February 25, 2019. *Whitman v. United States*, 139 S. Ct. 1276 (2019). Whitman was represented by the Garland law firm throughout the appeals process. On October 21, 2019, Whitman filed his motion to vacate his conviction pursuant to 28 U.S.C. § 2255. It should be denied in its entirety.

## II. Whitman's Claims

Whitman asserts as many as six grounds for relief, all of which are related to claims of ineffective assistance of counsel based on his attorney's alleged conflicts of interest and deficient performance. Whitman asserts that his attorney, Edward Garland, encouraged him to enter into a plea agreement with the government because of Garland's own financial interests and not because it was in the best interest of Whitman himself. There is no evidence to support his claim, and, even if it were true, Whitman did not enter into a plea agreement. Therefore, no ineffectiveness claim can lie there. Whitman also asserts that his attorney's assumption that he would forgo trial resulted in a lack of preparation, which caused him to forgo viable defenses at trial. Whitman's unsupported allegations are belied by the veritable army of attorneys who participated in his defense, before, during, and after trial. Moreover, forgoing the supposed defenses that Whitman now claims should have been asserted would have been a reasonable tactical decision for his counsel to make, falling well within the wide range of competent performance presumed by the courts.

Whitman also asserts ineffective assistance of counsel based on an actual conflict of interest stemming from the retention of Ms. Joyce Singer-Capek by his former assistant, Kelli Durham, who subsequently testified against Whitman at trial. Whitman alleges that, pursuant to Edward Garland's advice, he agreed to pay Ms. Singer-Capek $100,000 to retain her services for Ms. Durham. He further alleges that this representation created an impermissible conflict with his

subsequent retention of Douglas R. Thompson, whom Whitman had hired to handle tax matters for himself, his wife and their company.  Whitman claims, incorrectly, that Ms. Singer-Capek had privileged insight into his criminal case because Mr. Thompson was Ms. Singer-Capek's "partner", which made Ms. Singer-Capek's representation of a government witness against him a conflict of interest.  It may be that Whitman's tax attorney had a potential conflict that should have precluded his representation of Whitman while Ms. Singer-Capek was representing Ms. Durham; however, as explained below, Whitman knowingly waived any conflict associated with Ms. Singer-Capek's representation of Kelli Durham.  There was no conflict associated with Edward Garland's representation of Whitman.

In yet another attempt to make out an ineffective assistance of counsel claim, Whitman alleges that Mr. Garland failed to alert the trial court to bribery of a juror out of his own financial interests, but fails to demonstrate that a juror was actually bribed and fails to explain how it would be in his attorney's financial interest to allow the bribery to proceed undetected. Whitman also claims that Edward Garland provided ineffective assistance of counsel on direct appeal, for many of the same reasons articulated above.  All of Whitman's ineffective assistance claims fail.  At bottom, Whitman received his constitutionally mandated defense from a highly skilled, conflict-free attorney throughout the legal process and he has failed to show otherwise.

Finally, Whitman claims that the federal courts violated his due process rights and access to the courts by refusing to allow him to proceed pro se in pursuing a Rule 33 motion and requiring him to proceed with retained counsel on appeal.  These claims are baseless and should be summarily dismissed for the reasons discussed below.

### III. Legal Standard

The standard for weighing a claim of ineffective assistance of counsel is the two-part test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, a movant must show both that (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced the defense. *Id.* at 687. The court need not address both components of the inquiry if an insufficient showing is evident on either of them. *Id.* To demonstrate that a counsel's performance was deficient, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To establish prejudice, the defendant must show that the "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Review of counsel performance for constitutional deficiency is conducted based on an objective standard of reasonableness. The court's review "must be highly deferential," and view the attorney's "conduct from counsel's perspective at the time," rather than viewing counsel's choices with the benefit of hindsight. *Id.* at 689. The court begins its review with a "strong presumption" that the conduct of counsel fell "within the wide range of reasonable professional assistance." *Id.* The defendant bears the burden of demonstrating to the court that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*).

Deficient performance alone does not render representation ineffective; the defendant must also demonstrate his defense was prejudiced by his attorney's performance. Prejudice is sufficiently proved when the defendant can "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694.  Reasonable probability is "sufficient to undermine confidence in the outcome." *Id.*  Courts evaluate prejudice in view of the totality of the evidence, rather than any alleged error in isolation. *Id.* at 695-96.

## IV. Legal Argument

### 1.  Defense Counsel's Alleged Financial Conflicts are Baseless

Whitman alleges that his defense attorney, Edward Garland, had actual conflicts of interest stemming from his personal financial interests and those of his acquaintances.  The basis for this claim seems to be that Whitman's defense was expensive and that Edward Garland wanted to do as little work as possible on the case to justify his fees.  In cases involving counsel's personal interests competing with his client's, ineffectiveness is governed by the *Strickland* standard as articulated above. *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002); *see also Cruz v. United States*, 188 F. App'x 908, 913-14 (11th Cir. 2006) (unpublished).

Whitman alleges that the Garland firm collected a multi-million dollar fee from Whitman but never investigated alternative defenses such as illegal gratuity.  Indeed, Whitman claims that there was no scheme to defraud as his "actions were within what the business community considered 'honest dealing' and 'fair play.'" Dkt. 446 at 21.  These baseless claims are contrary to the evidence presented at trial and the jury's verdict.  The evidence at trial established that Whitman paid more than a million dollars in cash, cars, and other things of value to three base employees who steered trucking contracts to his firm (on which he overbilled the government by nearly $20 million) and to two other base employees who helped him steal more than 30 large pieces of construction equipment from the base.  Whitman's claim that this was just common

practice at the MCLB strains credulity and would not constitute a legal defense.  Foregoing such a defense was clearly within the objective standard of reasonableness as articulated in *Strickland*.

Whitman also claims that the Garland law firm billed him more than the $2 million initially thought to be sufficient for his defense, when his local counsel, Robert M. Margeson III, accessed certain additional funds that had been escrowed for Whitman and his wife's future use. Dkt. 446 at 13-14.  However, Whitman fails to connect the cost of his legal defense to any lack of diligence or performance on the part of his attorneys, and specifically, Edward Garland.  Similarly, Whitman alleges that "Mr. Garland's colleagues and friends had received millions of dollars in fees and commercial gains…" and that Edward Garland tried to convince Whitman to plead guilty and avoid trial in order to make as much profit as possible. *Id.* at 15.  But Whitman did not plead guilty. Whitman went to trial, despite his attorney's seasoned advice, and was convicted on all counts.[1]

Nothing Whitman claims that his attorney did because of his alleged personal financial interests—claims for which Whitman provides little or no support—comes close to deficient performance of counsel under the highly deferential *Strickland* standard.  With regard to Mr. Garland's recommendation that his client accept the government's plea offer, no claim of ineffective assistance can lie under either prong of the *Strickland* analysis.  Mr. Garland no doubt recognized the strength of the government's case against his client, especially after the government's reverse proffer, making the decision to pursue and recommend a plea well "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Further,

---

[1] Whitman would have been well served had he heeded his counsel's advice to enter into a plea agreement with the government as he would have been able to plead guilty to a single count of bribery, which has a statutory maximum of 15 years' imprisonment.  Instead of listening to his highly regarded criminal defense attorney's advice, Whitman listened to "God", Dkt. 446 at 15, and proceeded to trial, after which he was sentenced to 22 years in prison.

because Whitman did not actually enter into the plea agreement that he claims his attorney improperly pressured him to accept, there can be no prejudice. *See id.* at 694.

Assuming arguendo that Edward Garland did have an actual conflict as to his own financial interests, Whitman's claims of ineffective assistance still fall short of showing adverse effect. Whitman would have to show that a reasonable defense or strategy was forgone by Mr. Garland, and that there was a link between the decision to forego the defense or strategy and the conflict. *See Pegg v. United States*, 253 F.3d 1274, 1278 (11th Cir. 2001).

To be sure, Whitman raises a number of defenses his attorney chose not to raise. Most, however, were not reasonable given the facts of the case. For example, given the bribes totaling more than a million dollars and the nearly $20 million of ill-gotten gains involved in the case, it's entirely reasonable that Mr. Garland chose to forego trying to justify his client's conduct as "penny-ante in-kind payments that functionally are tips for good services." Dkt. 446 at 20. Even assuming some of the alternate courses of action Whitman suggests were reasonable, Garland's decision to forego those alternative courses of action do not fall outside the range of reasonable professional assistance. Ultimately, it was just a reasonable judgment call to choose the theory of defense that was pursued at trial. As such, Whitman has failed to establish either deficient performance or adverse effect.

### 2.   Defense Counsel was not Ineffective due to Conflicts of Interest

Whitman also claims that his assistant's retention of a criminal defense attorney affiliated with the firm that Whitman retained to handle his tax matters, was an impermissible conflict of interest that rendered Garland's representation of Whitman constitutionally deficient. As explained below, that is simply not the case. Moreover, Whitman's allegations do not satisfy the

requisite showings of deficient performance, prejudice, or actual conflicts of interest by his defense counsel as the record is completely devoid of any evidence that it adversely affected Edward Garland's representation of Whitman.

When ineffective assistance of counsel is based upon an attorney's alleged conflict, the inquiry is altered slightly.  If an alleged conflict stems from obligations to concurrent or former clients, prejudice to the defendant is presumed if he can meet a two part test identified in *Cuyler v. Sullivan*, 446 U.S. 335 (1980).  Assuming competing client interests, the defendant must show "*first*, that his attorney had an actual conflict of interest, and *second*, that the conflict adversely affected counsel's performance." *Pegg*, 253 F.3d at 1277 (citing *Ferund v. Butterworth*, 165 F.3d 839, 858 (11th Cir. 1999) (emphasis original)); *see also Cuyler*, 446 U.S. at 348. The defendant need not show the outcome of the trial would have been different; demonstrating a conflict's adverse effect on counsel's performance is sufficient ground for a violation of the defendant's Sixth Amendment rights. *Pegg*, 253 F.3d at 1278 (citing *McConico v. Alabama*, 919 F.2s 1543, 1548 (11th Cir. 1990).

Demonstrating an actual conflict of interest requires two showings; the defendant must show more than "a possible, speculative, or merely hypothetical conflict." *Reynolds v. Chapman*, 253 F.3d 1337, 1342-43 (11th Cir. 2001) (quoting *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987)).  First, the defendant must "point to specific instances in the record to suggest an actual conflict or impairment of their interests… Appellants must make a factual showing of inconsistent interests…." *Id.* at 1343 (quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987)).  Second, the defendant must "demonstrate that the attorney made a choice between possible alternative causes [sic] of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.  If he did not make such a choice, the conflict remain(s)

hypothetical." *Id.* (quoting *Smith*, 815 F.2d at 1404).  If the attorney does not act in a way that reflects the reality of his inconsistent interests, there is no actual conflict of interest.  *Id.* at 1344.

If an actual conflict is identified, the court evaluates whether there was an adverse effect on the defense with a three pronged test set forth in *Pegg*. To prove adverse effect, the defendant "must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." *Pegg*, 253 F.3d at 1278 (citing *Freund*, 165 F.3d at 860).

Whitman has failed to identify any actual conflict on the part of his defense counsel, Edward Garland.  Moreover, Whitman knowingly waived any potential conflict that his other attorney may have had.  After retaining the Garland law firm to represent him in the criminal matter, Mr. Garland suggested to Whitman that he assist in the retention of defense counsel for Whitman's assistant, Kelli Durham, who was also a target of the government's investigation. Edward Garland recommended that Ms. Durham retain the services of Janice Singer-Capek, a well-regarded criminal defense attorney whom he had worked with in the past, and that Whitman pay for such representation.  Ms. Durham officially retained Ms. Singer-Capek in June 2012. According to Whitman, he agreed to pay Ms. Singer-Capek $100,000 for this representation and understood that her representation and obligations were solely to Ms. Durham.

As part of his representation of Whitman, Edward Garland also recommend that Whitman retain Douglas R. Thompson of Thompson & Singer, P.A., to handle his criminal tax matters. Whitman followed his counsel's advice and retained Mr. Thompson to represent Whitman, his wife and their company, ULOC, regarding unpaid state and federal taxes.

After representing Ms. Durham for approximately six months, during which time there was very little activity, Ms. Singer-Capek discovered that her partner, Mr. Thompson, had begun representing Whitman, his wife and their business on tax matters.  Contrary to Whitman's claims, Ms. Singer-Capek and Mr. Thompson did not share "confidential and privileged" information about Whitman. Dkt. 446 at 17.  Although the two attorneys practiced under the same firm name, they were not "partners" in the traditional sense.  They had their own completely separate law practices and were affiliated in name only and through the use of shared office space.  They did not share revenue and each attorney had their own server so they did not have access to each other's client files.  Moreover, the two had never discussed the details of Mr. Thompson's representation of Whitman, his wife, or their business regarding their tax issues.  *See* Exhibit A (Affidavit of Janice Singer-Capek).

Nevertheless, Ms. Singer-Capek immediately informed all of the parties of the actual or potential conflict of interest that existed with her representation of Ms. Durham and Mr. Thompson's representation of Whitman and his wife regarding their tax issues.  Ms. Singer-Capek advised Ms. Durham of the situation, after which Ms. Durham requested that Ms. Singer-Capek continue her representation despite the potential conflict.  Mr. Garland similarly advised Whitman and his wife of the actual or potential conflicts associated with Ms. Singer-Capek's representation of Ms. Durham and they too agreed to waive any conflicts in order to permit the representation.  Accordingly, in February 2013, Whitman and the other parties executed an agreement waiving any actual or potential conflicts. Exhibit A.  In doing so, Whitman attested to the following:

> "I have read the contents of this letter and I understand it fully.  I know of the conflicts and the dangers.  I have also consulted with separate counsel and after doing so, hereby waive any and all conflicts, agree to be responsible for Ms. Durham's legal fee and request that with the exception of Janice Singer-Capek, Thompson & Singer, P.A., its successors ans [sic] assigns and specifically Douglas

R. Thompson and Baxter Thompson continue representing me in the tax matters
for which they have been retained."

As such, Whitman's claims of an impermissible conflict are without merit.  First, he has failed to

identify any conflict that Edward Garland may have had.  Indeed, any potential conflict rested with

his tax counsel; however, to the extent that an actual or potential conflict existed there, he

knowingly waived such a conflict.  *See United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994)

("Even where an actual conflict exists subjecting the attorney to disqualification, the client may

waive this conflict of interest and elect to have the attorney continue representation, so long as the

waiver is knowing, intelligent and voluntary."); *United States v. Garcia*, 447 F.3d 1327, 1337

(11th Cir. 2006).

Nevertheless, Whitman claims that this conflict between his tax attorney and Ms. Durham's

counsel, Ms. Singer-Capek, which he knowing waived in early 2013, rendered Mr. Garland's

representation of Whitman constitutionally defective.  However, Whitman has failed to establish

the requirements enunciated in *Cuyler*—first, that his attorney had an actual conflict of interest,

and second, that the conflict adversely affected counsel's performance.  To demonstrate that

Edward Garland had an actual conflict, Whitman would have to show that Mr. Garland represented

other clients with inconsistent interests, and that Mr. Garland chose the interests of another client

over his. *See Smith*, 815 F.2d at 1404.  Mr. Garland represented only Whitman; there was no other

client for Edward Garland to choose.  Further, if as Whitman claims, Mr. Garland sought to place

Ms. Durham with Ms. Singer in order to keep her from damaging Whitman's case, it demonstrates

that his loyalty was to Whitman, regardless of the outcome of that strategy.[2]  Finally, assuming for

---

[2] Contrary to Whitman's allegation, Ms. Singer-Capek was never "Mr. Garland's co-counsel" and never
owed Whitman an "unwaivable duty." Dkt. 446 at 18.  Ms. Singer-Capek represented Whitman's assistant,
Kelli Durham, and when her interests diverged from those of Whitman, Ms. Singer-Capek's duties were to
Ms. Durham, not to Whitman.

the sake of argument that there was in fact a conflict, the record is completely devoid of any evidence that it adversely affected the Garland firm's representation of Whitman.  As such, Whitman's claim of ineffective assistance of counsel due to an impermissible conflict is without merit and should be dismissed.

### 3.   Defense Counsel was not Ineffective due to Undiligent Preparation

Whitman's assertion that his attorney was unprepared, thus depriving him of his right to effective counsel, is similarly without merit.  His allegations demonstrate his regret at paying what he considers to be high attorney's fees, but indicate nothing about his counsel's diligence and effectiveness.  Whitman makes the assumption that his attorney was unprepared for trial after Whitman declined to enter into a plea agreement with the government; however, there is nothing in the record to support this claim.  Indeed, just the opposite is true.  As such, *Strickland* again forecloses Whitman's claim for relief.

Under *Strickland's* first prong, Whitman must show deficient performance by counsel, which he has failed to do. 466 U.S. at 687.  There is nothing in the record to support Whitman's assertion that the Garland law firm was not diligent in its defense of Whitman before, during or after trial.  Whitman was represented by multiple attorneys including Edward Garland, Matthew D. Daley, John A. Garland, Donald F. Samuel, Robert M. Margeson III, and Leigh Ann Flynn among them, throughout the proceedings.  The firm represented Whitman and his wife pre-indictment during which time it lobbied the government against charging Whitman's wife, Becky Whitman, who was never charged in the case.  The firm represented Whitman post-indictment at the arraignment and subsequent detention hearing.  Prior to trial the defense filed motions in limine (Dkt. 101, 115) and, during the six-week trial, represented Whitman zealously by making timely objections and cross-examining the government's witnesses at length.  Indeed, there is no evidence

to support Whitman's claim of a "total deprivation of counsel", Dkt. 446 at 14, and that he did not get what he paid for.

Nevertheless, Whitman claims that Edward Garland was unprepared for trial and that he failed to investigate certain defenses claiming, without support, that he "neither investigated the facts nor researched the law." *Id.* at 20. When a failure to investigate is the basis of an ineffective assistance claim, as Whitman alleges here, "the decision not to investigate must be directly assessed for reasonableness… applying a heavy measure of deference to counsel's judgments." *Strickland*, 446 U.S. at 691. That reasonableness is influenced by what the defendant tells counsel. *Id.* Notably, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.* Whitman acknowledges in his motion that he "explained to Mr. Garland the essential events leading to the charges," that he told his attorney that the scheme was the idea of the MCLB employees who were involved, and that the culture of MCLB-Albany facilitated such dirty dealings. Dkt. 446 at 20.

Mr. Garland knew all he needed to know about Whitman's proposed defenses because Whitman told him. Moreover, Mr. Garland attempted to establish some of the proposed defenses at trial—particularly that Whitman had been extorted by the employees at MCLB. That Mr. Garland did not pursue all of these purported defenses or asserted some of them only as a last ditch effort was a reasonable decision for him to make. Because Mr. Garland's investigative and strategic decisions were well within the bounds of reasonableness, his performance was not deficient.

Even if assuming arguendo that Mr. Garland's performance was deficient, Whitman cannot show prejudice under *Strickland*'s second prong. To prevail, Whitman must "affirmatively prove

prejudice," and he cannot. *Strickland*, 466 U.S. at 693.  Whitman cannot show the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Importantly, none of the defenses Whitman claims his attorney should have asserted alter the facts before the jury.  At trial, multiple witnesses testified that Whitman paid them bribes in exchange for the millions of dollars of transportation contracts and assistance in stealing the construction equipment from the base.  Whitman's assistant, Kelli Durham, testified that she falsified invoices and bills of lading at Whitman's direction and others testified to Whitman's obstruction of the government's investigation and destruction of evidence.  Any effect these foregone defenses could have had, therefore, would be "isolated" or "trivial." *Id.* at 696.

Further, Whitman's attorney, in his opening, closing, and cross-examination of government witnesses raised the issue of Whitman's lacking intent to bribe and need to "pay to keep doing business." *United States v. Whitman*, 887 F.3d 1240, 1244-5 (2018).  The jury did not buy it.  When Whitman raised the issue of this defense on appeal, the Eleventh Circuit took note of the district court's determination that there was "little, if any evidence in the record of the payments being made as gratuit[ies]." *Id.* at 1245.  It strains credulity to think that any further investigation would have made any difference.  The alleged omission or lack of investigation of such defenses had no effect on the outcome of Whitman's trial.

### 4. Whitman's Claims of Ineffective Assistance of Counsel at Sentencing and Errors by the Court in Calculating his Guideline are Baseless

To succeed on a claim of ineffective assistance of counsel during the sentencing phase of a trial, a petitioner "must show both incompetence and prejudice: (1) [P]etitioner must show that counsel's representation fell below an objective standard of reasonableness, and (2) [P]etitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Chandler*, 218 F.3d at 1312-13 (internal

quotation marks and citation omitted). Whitman has failed to establish either prong of the required showing.

Whitman alleges ineffective assistance of counsel based upon Edward Garland's failure to object to the court's misapplication of United States Sentencing Guideline (USSG) §1B1.3 in determining his sentence. He does not allege how §1B1.3 was misapplied, he merely states that the court "overlooked" Amendment 790 to the USSG, and that his counsel should have objected to the court's omission. In support of these claims Whitman alleges that defense counsel failed to present documentation at sentencing contrasting what other trucking companies had charged the government with that charged by ULOC in order "to reflect the value the government received." Dkt. 450 at 24. Such information would have been irrelevant as the government established at trial that Whitman billed the government more than $37 million during the relevant four year period and that more than $17 million of that was due to fraud. Rates charged by other trucking companies were irrelevant to the issues at sentencing and the determination of Whitman's Guideline.

Whitman claims that the trial court erred by overlooking Amendment 790 to the USSG regarding the determination of relevant conduct and "chose the wrong guidelines as a starting point when conducting its 18 U.S.C. § 3553(a) analysis." *Id.* Neither of these claims has any merit. Whitman's Guideline range was properly calculated by the Probation Office as reflected in the final Presentence Investigation Report (PSR), Dkt. 214 at 13-14, which was adopted by the court at sentencing. *See* September 10, 2015 Sentencing Transcript at 56-59. This calculation began with a Base Offense level of 12 pursuant to USSG §2C1.1, which is the applicable guideline section for bribery. The Base Offense level was then increased by several Specific Offense Characteristics including: more than one bribe (+2), the loss to the government (+22), and that the

offense involved a high-level decision maker (+4).   The Guideline calculation was increased further pursuant to two Adjustments including: organizer or leader (+4) and obstruction of justice (+2).   This resulted in an Adjusted Offense Level of 46; however, pursuant to Chapter 5, Part A of the USSG, Whitman's Total Offense Level was capped at 43.

Although Whitman claims that the court erred in its calculation of his Guideline range, his motion is directed at defense counsel and his alleged failure to object to the court's Guideline calculation.   Dkt. 450 at 24.   However, Whitman failed to identify how the Guideline calculation was flawed or what the proper Guideline should have been.   Moreover, defense counsel provided the Probation Office with a three-page letter on August 18, 2015, lodging numerous objections to the draft PSR including the loss calculation and the application of the Adjustment for high-level decision maker, which he reiterated at sentencing.   *See* Exhibit B.   These objections were considered by both the Probation Office and the Court but ultimately rejected as unfounded.

As indicated above, there is no foundation whatsoever for Whitman's allegation that his defense counsel "miscomprehended the law" as to sentencing and certainly nothing to indicate that defense counsel's representation of Whitman failed to meet the objective standard of reasonableness as required by *Strickland*. 466 U.S. at 687.   Accordingly, the Court should dismiss Whitman's claims regarding sentencing.

### 5. There is no Evidence to Support Whitman's Claim of Jury Tampering or Ineffective Assistance of Counsel Regarding that Claim

Whitman further alleges, without factual support, that Edward Garland's representation of Whitman was constitutionally defective because he failed to inform the court of jury tampering. Dkt. 446 at 14.   More specifically, Whitman claims that during jury deliberations he learned from his brother, Brain Whitman, that Brian had made arrangements to pay a juror $20,000 to insure

that petitioner was not convicted at trial, and that Brain had made an initial down payment of $500 to the juror's boyfriend. Whitman further claims that he told Mr. Garland about this information who counseled him against informing anyone about a juror who was supposedly bribed in his favor. *Id.* at 22-24. Whitman's claims of jury tampering strain credulity and are unsupported by any admissible evidence; however, even if accepted as true, they do not constitute constitutionally deficient performance as Whitman cannot meet his heavy burden of demonstrating that "no competent counsel would have taken the action that his counsel did take." *See Chandler*, 218 F.3d at 1315.

Had the court heard Whitman's allegation, if it did not dismiss the claim outright as the last desperate reach of a defendant willing to pull out all the stops, a brief inquiry would have revealed Whitman's allegation was, in fact, false. Whitman's brother, who Whitman claims arranged the bribe, was interviewed by the Naval Criminal Investigative Service (NCIS) after Whitman's allegation was first revealed to the government nearly three years after the conclusion of the trial. His brother denied any such conduct, stated he never met the juror, and said he had no knowledge of anyone he knew giving money to her. *See* Exhibit C (NCIS Report of Investigation 23MAR18). Further, because the juror was allegedly bribed *in Whitman's favor*, and he was convicted on all counts, confidence in the verdict should remain unshaken.

Even assuming Edward Garland conducted himself as Whitman alleges, and that not informing the court of the supposed jury tampering did constitute deficient performance, Whitman still falls woefully short of *Strickland*'s second prong; he cannot show prejudice resulting from counsel's strategic decision. If he is to succeed, Whitman must show a "reasonable probability" that the result of his trial would have been different had counsel brought his claim of jury tampering, in his favor, to the court's attention. *Strickland*, 466 U.S. at 694. Indeed, nothing

Whitman presents in his motion demonstrates any probability that he would not have been convicted; his bald allegations do nothing to "undermine confidence in the outcome" of his guilt. *Id.*

Even if Whitman's claim was colorable, the appropriate remedy is not the vacation of petitioner's conviction, but an evidentiary hearing to examine the claim.  However, in order to merit a hearing on his claim, "the petitioner must set forth specific facts which he is in a position to establish by competent evidence." *Marchibroda v. United States*, 368 U.S. 487, 495-96 (1962); *see also Wade v. United States*, 504 U.S. 181, 186 (1992) (petitioner is required to make a substantial threshold showing that he is entitled to such a hearing).  The duty of the trial court to investigate arises "only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."  *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984).  An evidentiary hearing is unnecessary when the petitioner's allegations are "patently frivolous," "based upon unsupported generalizations," or "affirmatively contradicted by the record."  *Diveroli v. United Sta*tes, 803 F.3d 1258, 1264 (11th Cir. 2015); *Rosin v. United States*, 786 F.3d 873, 877 (11thc Cir. 2015); *see also Hayden v. United States*, 637 F. Supp. 1202, 1204 (S.D.NY. 1986) (evidentiary hearing on jury tampering charge not justified in the absence of admissible evidence in support of the charge; hearsay is insufficient).

It is true that in *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court stated that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229.  But in *Remmer*, there was little question that jury tampering had been attempted because the juror reported it.  *Id.* at 228.  In Whitman's case, the lynchpin of the alleged scheme to bribe the juror, Whitman's brother, told federal investigators that it never

happened, and no juror ever came forward to corroborate Whitman's claim. Whitman's story does not add up and, as such, it should be disregarded by the Court.

### 6. Whitman's Claims of Due Process and Right to Counsel Violations are Baseless and Should be Dismissed

Finally, Whitman claims that he was denied his constitutional right to due process and access to the courts when he was not permitted to file his motion for new trial with the trial court and because he was not permitted to proceed with his appeal pro se instead of being represented by the Garland law firm.  Neither claim has any merit.

First, Whitman claims that he was denied the opportunity to file his Rule 33 motion to vacate his conviction, thereby denying him due process.  The basis of his motion was that he was denied a fair trial because a juror had been bribed, albeit in his favor.  Whitman did not attempt to file his motion until early 2018, nearly three years after his conviction.  However, by that time Whitman's appeal was pending before the Eleventh Circuit, which divested the district court of jurisdiction to entertain his filing.  *See* Fed. R. Crim. P. 33(b)(1) ("If an appeal is pending, the [district] court may not grant a motion for a new trial until the appellate court remands the case."); *see also* Dkt. 432.  Moreover, Whitman's motion would have been untimely because it was not based upon newly discovered evidence.  *See* Fed. R. Crim. P. 33(b)(2). ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.").  Whitman claims that he learned of the alleged jury tampering while the jury was deliberating and prior to the verdict on March 3, 2015.  As such, Whitman had until March 17, 2015, not three years, in which to file his motion.  Accordingly, there was no denial of due process from his alleged inability to file his Rule 33 motion with the Court in early 2018.

Whitman also claims that he was denied access to the courts when he was not permitted to proceed either on appeal or in the district court pro se.  Again, Whitman's claims are unfounded. As indicated above, the district court lacked jurisdiction to hear Whitman's claims during the pendency of his appeal.  Moreover, Whitman had retained Edward Garland and his firm to represent him through trial and appeal.  Edward Garland did so, providing effective representation throughout and filing his appellate brief with the Eleventh Circuit on June 27, 2016.  After briefing was complete, oral argument was scheduled before the Circuit on March 7, 2018.  It was not until March 5, 2018—two days before oral argument in the Eleventh Circuit—that Whitman filed his request to stay the appeal and proceed pro se. Dkt. 432.  In accordance with Whitman's wishes, Edward Garland filed an emergency motion to withdraw and stay further proceedings in the appeal, which was denied that same day by the Circuit.  Edward Garland renewed his emergency motion on Whitman's half at the outset of oral argument; however, the Eleventh Circuit again denied the motion. *See* Dkt. 429 at 2.

Whitman's claim that he was denied due process and access to the courts is unfounded as it is well established that he has no constitutional right to self-representation on appeal.  *See Martinez v. Court of Appeal of California*, 528 U.S. 152, 163 (2000).  Moreover, "once counsel's brief is filed, a motion to proceed pro se is untimely."  *United States v. Cockerham* 396 F. App'x 66, 68 (5th Cir. 2010) (citing *United States v. Wagner*, 158 F.3d 901, 902-03 (5th Cir. 1998) (in the context of the filing of an *Anders* brief)) (unpublished).  As indicated above, Whitman's appellate brief was filed with the Eleventh Circuit in June 2016—twenty-one months prior to the filing of his motion to stay in March 2018.  Accordingly, Whitman has failed to establish how the Circuit court erred in denying either his motion to stay the appeal or his counsel's motion to withdraw, which was filed literally on the eve or oral argument.

## CONCLUSION

There is no factual or legal basis to support Whitman's claims for collateral relief. Whitman is in prison because of the overwhelming evidence of his guilt, not because of the ineffective assistance of his attorney or the jury tampering he alleges without foundation. Accordingly, Whitman's motion to vacate his conviction should be denied in its entirety.

DATED: December 23, 2019                    Respectfully submitted,

                                            COREY R. AMUNDSON,
                                            Chief, Public Integrity Section
                                            Criminal Division
                                            United States Department of Justice

                                            /s/ *Richard B. Evans*
                                            RICHARD B. EVANS
                                            Trial Attorney
                                            Public Integrity Section
                                            Criminal Division
                                            United States Department of Justice
                                            1331 F Street NW, 3rd Floor
                                            Washington, DC 20004
                                            Richard.B.Evans@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2019, I caused a copy of the foregoing pleading to be filed via ECF and thereby served on counsel of record for all parties.  I also caused a copy of the foregoing pleading to be mailed to petitioner at the following address:

CHRISTOPHER WHITMAN
Prisoner No. 97202-020
FCI COLEMAN LOW
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 1031
COLEMAN, FL 33521


/s/ *Richard B. Evans*
Trial Attorney
Public Integrity Section
Criminal Division
United States Department of Justice