UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

Filed at_____1:30 P. M
4/23    20 20
Deputy Clerk, U.S. District Court
Middle District of Georgia

Christopher Whitman,

    Petitioner,

v.

United States of America,

    Respondent.

Case No.  1:19-CV-183(WLS)
Crim. No. 1:14-CR-1-1(WLS)

_____/

## REPLY TO GOVERNMENT'S OPPOSITION TO § 2255 MOTION

The United States opposes vacating Mr. Whitman's criminal conviction, despite a bribed juror and conflicted counsel. In its response, the government overlooks that under the § 2255 statutory process, Mr. Whitman's allegations are presumptively true until there is an evidentiary proces. The government requests that this court disregard governing precedent, which requires this court to presume prejudice in the context of the tampered jury and the adversely-affected conflicted counsel, and which requires an evidentiary hearing to resolve the contested factual issues.

Mr. Whitman turns to the government's specific responses.

### 1. Garland Failed to Prepare for Trial

With regards to defense counsel's lack of preparedness, the government states that "Whitman did not enter into a plea agreement. Therefore, no ineffectiveness claim can lie there." (Resp. at 4). The government misunderstands the allegation, Mr. Garland's vehemence in insisting Mr. Whitman plead guilty——so much that he blashpemes God——reveals that Mr. Garland did

not prepare for trial and did not want to proceed to trial. Mr. Garland shirked interviewing witnesses and obtaining industry practice evidence, because he thought he had full control of Mr. Whitman. Thus, Mr. Garland could compel Mr. Whitman to plead guilty.

Significantly, Mr. Garland admits that it was only during the jury-instruction phase of the trial, that he began to comprehend that the facts sounded more in improper gratuity than quid pro quo bribery. From which, the most reasonable supposition is that Mr. Garland did not prepare for trial, and he was shocked when Mr. Whitman became a "three-percenter" and went to trial.

Conceivably, Mr. Garland's vehemence arose from a legitimate concern that a trial would illuminate the suspicious financial transactions. (Resp. at 4)(Doc. 1 at Ground One). We recognize the government claims "[t]here is no evidence to support [t]his claim...." (Resp. at 4). But that is incorrect. Mr. Whitman's verified pleadings are filed, and these allegations are from his personal knowledge or observation, thus Mr. Whitman, and Mr. Whitman alone, has proffered evidence. See **Caldwell v. Warden**, 748 F.3d 1090, 1098 (11th Cir. 2014); **White v. Berger**, 2019 U.S. App. LEXIS 11417 n.2 (11th Cir. 2019)(unpublished); Cf. **United States v. Stein**, 881 F.3d 853, 854 (11th Cir. 2018) (en banc). Mr. Whitman's record-supported allegations, if true, establish that defensen counsel did not adequately prepare for trial.

On this record, the law entitles Mr. Whitman either to either an evidentiary hearing or to a new trial. 28 **U.S.C.** § **2255(b)**; **Aron v. United States**, 291 F.3d 708 (11th Cir. 2002).

## 2. Ms. Singer's Affidavit Contested Mr. Whitman's Verified Pleadings

Ms. Singer had a conflict: she knew of Whitman's defense strategy before her representation of Ms. Durham commenced. Ms. Singer exploited that knowledge

when she encouraged Ms. Durham to testify against Mr. Whitman (the reason she told Mr. Whitman to stop paying her). The obvious conflict was the reason that Mr. Thompson and Mr. Garland left the room to discuss Ms. Singer's representation of Ms. Durham when Mr. Garland first presented the idea. And this served as the impetus for the waiver that Mr. Whitman unintelligently signed.

Hence, an actual conflict existed. Ms. Singer's firm simultaneously represented Ms. Durham and Mr. Whitman, although each was adverse to each other; especially when Ms. Durham became the government's key witness against Mr. Whitman.

The only question is whether Mr. Whitman's waiver was knowing and voluntary, and why neither the government nor defense counsel brought the conflict to the court's attention. Particularly, when Ms. Durham was testifying against Mr. Whitman while Mr. Whitman was represented by the same firm.[1] No rational person would have paid tens of thousands of dollars to ensure elite-grade representation for the key witness against him.

In the light of Ms. Singer's affidavit, the issue of voluntariness is in controversy, that is, Ms. Singer's affidavit conflicts with Mr. Whitman's verified pleadings, which, in turn, requires this court to conduct an evidentiary proceeding. See **Garces-Hurtado v. United States**, No. 19-11598 at 7 (11th Cir. April 1, 2020)(unpublished)(citing **Friedman v. United States**, 588 F.2d 1010, 1015 (5th Cir. 1979)(affidavits alone are insufficient to resolve a factual dispute in a § 2255 proceeding).

In order to ascertain the facts, this court should conduct a hearing at which Ms. Singer-Capek, Mr. Thompson, Mr. Garland, Mr. Samuel, Mr. Whitman, Mrs. Whitman, and Ms. Durham should testify——concerning the events surrounding Ms. Durham's hiring Ms. Singer and the waiver letter signed by Mr. Whitman without

---
[1] Thompson and Singer, P.A.

the advice of independent counsel. Testimony that will reveal that Mrs. Whitman disagreed with the idea of paying for Ms. Durham's counsel (marital property used), and that Mr. Garland persuaded Mr. Whitman to spend the money by indicating that Mr. Garland could influence Ms. Singer and help with Mr. Whitman's cause.

### 3. Financial Conflict of Interest

In the grand tradition of the Sophist, the government begs the question of whether a financial-interests conflict exists, and whether it had an adverse effect on trial counsel's representation. The government's argument *against* the "financial interests" claim is essentially ipse dixit. Mr. Evans asserts: "These baseless claims are contrary to the evidence presented at trial and the jury's verdict." (Resp. at 7). Which is exactly the point. Except for Mr. Whitman's counsel conflict, other evidence would have been presented at trial.

Included in the other evidence is that both military base personnel, and the business community's lawyers either implicitly or explicitly approved of the "gratuity practice". Further, showing their approval, that they or their clients received more than five million dollars from tainted property.

In order not to balloon this reply beyond allowable page limits, we defer the desciption of other alternative strategies until a later stage or until directed by the court to enter the evidence alongside a page expansion.

A prime example of the attorney's behavior is when Robert M. Margeson, III told Mr. Whitman that the Atlanta boys (Garland, et al) "did not take of him" as promised. Thus, he did not get done what needed to be done and he needed another several hundred thousand dollars to complete the trial-related work (even though the trial was just hours away). Of course, as a precaution for his work, he had taken the $400,000 placed in escrow for Mrs. Whitman. This unilateral decision

by Mr. Marcheson is disturbing, worse yet, "What was not done" was exclusively in Mr. Marcheson's control and knowledge. Put differently, Mr. Marcheson admitted the defense team was unprepared because of a lawyer dispute on how to divide the booty. Presumably, at the evidentiary hearing, we will learn what the "what" is. However, it is certain that money, not Mr. Whitman's interest, drove the "veritable army of attorneys who participated in [Whitman's] defense." (Resp. at 4).

On the existing record, only Mr. Whitman's verified allegations exist. This court must either presume these allegations true or, if deemed contested by the government's argument, then the law requires this court to order an evidentiary hearing. **Aron,** 291 F.3d at n.5; **Williams v. United States,** 660 Fed. Appx. 847 (11th Cir. 2016)(unpublished). If presumed true, then Mr. Whitman had no advocate, let alone a zealous one. The attorneys were fed up with Mr. Whitman, who was merely "innocent until proven indigent."

### Government's Response is Unscientifically Suspect

Government's counsel stretched his counter-argument well into the zone of improper speculation. Mr. Evans speculates that "Mr. Garland no doubt recognized the strength of the government's case ... especially after the government's reverse proffer...." (Resp. at 8). First, Mr. Whitman is unaware of what reverse proffer the government is referring[2] to. Second, in the absence of clairvoyant telepathy, this court should allow Mr. Garland to state what his thoughts were, rather than opposing counsel testifying[3] for Mr. Garland or any witness.

But on this record, Mr. Garland's thoughts are unknown, and Mr. Evans's hindsight ideas (or clairvoyant telepathy) do not count. This court should conduct an evidentiary hearing.

---

[2] The government's allegations, if true, likely reveal a new claim. If Mr. Whitman had known of the reverse proffer, then Mr. Whitman may have made a more informed decision.

[3] Incidentally, "God'[s] advise [sic]" has a tendency to prevail over time, since his extra-singularity (beyond the material) existence permits his trans-temporal perception, an ability that makes Mr. Evans seems to desire, based on his comments about knowing what Mr. Garland thinks!

## 4. An Adverse Consequence in Base Relief

The government's counter-argument rests on the supposition that the adverse-effect element of a conflict-of-interest claim has not been sufficiently pleaded. Before resting on the adverse-effect examples in the original motion, once again, Mr. Whitman points our a simple adverse consequence: Mr. Garland never suggested that Mr. Whitman testify against Ms. Durham, who had more knowledge of the offense conduct than Mr. Whitman did. Mr. Garland did not propose this strategy, because it would have revealed his financial conflicts, the Charles Peeler, Esq. conflicts, and the conflicts with Ms. Singer. In other words, the attorney conflicts prevented a strategy where Mr. Whitman testified against Ms. Durham and a host of other contractors and government employees. Not to mention it prevented the attorneys from suggesting Mr. Whitman that he reveal (and trade) his knowledge of the attorneys (or their clients) raiding or self-dealing in the forfeitable property.

Beyond this, Mr. Whitman's earlier descriptions of the unselected alternative course(s) of action, which were set forth in the § 2255 motion, demonstrate adverse consequences.

## 5. This court did not like Mr. Whitman's Rule 33 pleadings. Hence, this court decided to teach Mr. Whitman a lesson in gamesmanship. It engaged in a series of actions that caused Mr. Whitman to have to use a conflicted attorney and denied Mr. Whitman access to the court.

The Constitution's due process and equal protection provisions require the government, including the courts, to treat similarly-situated persons alike[4], and to guarantee an individual access to the court for redress of grievances.[5] This court refused to permit Mr. Whitman the opportunity to present a new trial motion.

---

/4 Cf. generally **Martin v. Franklin Capital Corp.**, 546 U.S. 132, 139 (2005)(a "basic principle of justice [is] that like cases should be decided alike").

/5 **U.S. Const. Amend. I** (1791) .

1. Mr. Whitman personally told Mr. Garland of the bribery,

2. Brian Whitman told his (and Mr. Whitman's) mother of the event. (Exhibit "1"),

3. Brian further told his mother that Mr. Garland told him (Brian) never to mention it. (Exhibit "2"),

4. Brian told Mr. Whitman that he paid Ms. Hayes's paramour the $500. Thus, technically, his alleged statement to NCIS is true,

5. Mr. Garland did not bring this matter to the court's attention, and

6. Ms. Hayes, the bribed juror, performed the nonverbal signal, acknowledging the act of bribery.

These verified and specific allegations are presumptively true, if proven, then this court will be required not only to grant § 2255 relief but also to vacate the conviction. See **Remmer**, 347 U.S. at 229.

We next take a look at Mr. Evan's deft use of the NCIS report on "Brain (sic)[6] Whitman." (Resp. at 18, 19). Brian Whitman told the NCIS investigator that "he thought [Kesha Lawana] "HAYES" served as a juror in his brother's trial. (Resp., Exhibit "C", p.1 ¶2). When asked by the NCIS agent if anyone gave her money, Brian said, "'not from anybody I know' and, by the way, I do not want to talk anymore without an attorney." **Id.**

A much better response from Brian than we are likely to see from the television show named after the U.S. Naval Criminal Investigation Service, where the witness will promptly break down, with or without pressure from NCIS, and chat away sans counsel. But the self-serving, self-protective, oblique statements are diametrically opposite to what Brian told Sandra Burlen Whitman and Christopher Whitman and Ed Garland. (Petitioner Composite Exhibit "1")(emails).

---

[6] We get it, the spell check recognized "Brain" as a real word, but since this occurred several times in the government's response, we had to mention it.

Assuming the NCIS report has legal weight equivalent to an affidavit, this court must resolve the factual contest in an evidentiary hearing. **Garces-Hurtado**, No. 19-11598 at 9-10 (citing **Friedman v. United States**, 588 F.2d 1010 (5th Cir. 1979)(per curiam)("Because there are contradicting versions of what happened, an evidentiary hearing is required to resolve the factual issues".).

If Mr. Whitman's allegations are true, not only did Mr. Garland drop the ball, but also this court entered a fundamentally flawed judgment.[7]

### Evidentiary Hearing

The government seeks to avoid an evidentiary hearing be reciting the proper rule, "'the petitioner must set forth specific facts which he is in a position to establish by competent evidence.' **Marchibroda [sic] v. United States**, 368 U.S. 487, 495-96 (1962)." (Resp. at 20). Mr. Whitman's verified pleadings demonstrate that he is able to personally testify as to the events. The written proffer of others identifies their personal knowledge and competency to testify. Mr. Whitman's allegations are specific to date, time, place, and content. If the allegations are proven true, then the trial was unfair. Governing law provides that this court will conduct an evidentiary hearing unless the record conclusivelyrefutes the claim. **Garces-Hurtado**, No. 19-11598 at 6-7; **McCalla v. United States**, 2018 U.S. App. LEXIS 9299 (11th Cir. 2018)(unpublished); **Williams**, 660 Fed. Appx. at 849 (citing and quoting **Machibroda**, 368 U.S. at 494-95).

---

[7] We note that any bribery for or against the defendant is unacceptable. And here, one can imagine what this juror did when she received only $500 of the $20,000 bribe.

## CONCLUSION

The law requires an evidentiary hearing, and the better and more efficient course for this court to unite the legal equivalent of the Guardian Knot by vacating the conviction and returning the parties to the status quo ante.

Prepare with the assistance of Frank L. Amodeo and respectfully submitted by Christopher Whitman on this _15th_ day of _April_ , 2020:

                          Christopher Whitman
                          Reg. No. 97202-020      Unit B-1
                          Federal Correctional Complex
                          P.O. Box 1031 (Low Custody)
                          Coleman, Florida 33521-1031

## CERTIFICATE OF SERVICE

This motion was delivered in a postage-prepaid envelope to the prison mailing authorities on the same day as signed.

The original motion was sent via United States First Class Mail to the United States District Court for the Middle District of Georgia, Office of the Clerk at 201 W. Broad Avenue, Albany, Georgia 31701.

A copy of this motion was sent to the United States via its attorney of record at 201 W. Broad Avenue, 2nd Floor, Albany, Georgia 31701.

                          Christopher Whitman

## VERIFICATION

Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear that the factual allegations and factual statements contained in this motion are true and correct to the best of my knowledge.

                          Christopher Whitman

-11-