## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA

**UNITED STATES OF AMERICA,**              **Civil Docket No. 1:19-cv-00183**
                                          **Criminal Docket No. 143-cr-00001**


**V.**


**CHRISTOPHER WHITMAN,**                   **SUPPLEMENTAL MEMORANDUM OF**
                                          **LAW IN SUPPORT OF 28 U.S.C. §2255**
                                          **MOTION**

_____**xx**

        COMES NOW, Christopher Whitman, by and through undersigned counsel, and files his

supplemental memorandum of law in support of his 28 U.S.C. §2255 motion.

### COURSE OF PROCEEDINGS

        In the April of 2012, Christopher Whitman's trucking operation was shut down, because he

was under investigation for the criminal activity subsequently charged in the underlying indictment

in this case. Whitman hired the Garland Law Firm, Ed Garland and his law partners and associates,

to represent him in the investigation and subsequently in the trial and appeal in this case.

        On January 16, 2014, a sealed indictment was handed down in the U.S. District Court for the

Middle District of Georgia. On January 22, 2014, Mr. Whitman was arrested on that indictment

together with his do-defendants, Shawn McCarty and Bradford Newell. Mr. Whitman was ultimately

released on bond and he and his lawyers prepared for trial. The first thing Ed Garland did, in June

of 2012, was refer Mr. Whitman to Douglas R. "Ron" Thompson, a partner in the law firm of

Thompson Singer, Attorneys at Law. Thompson Singer specialized in tax law, and Mr. Thompson

worked closely with Mr. Garland and Mr. Whitman in preparing the defense and dealing with the

Internal Revenue Service, a residual consequence of the investigation. As billing records show,

Thompson Singer actively worked on the tax portion of the case, in conjunction with Ed Garland, so additional consequences would not be forthcoming from a separate agency.

The case went to trial by jury in February 2015. The jury was given the case on February 23, 2015, but the jury elected to begin deliberations the following morning on February 24, 2015. The jury reached a verdict on March 3, 2015, finding all defendants guilty on all counts: Mr. Whitman was found guilty by jury trial of 54 counts in a 57-count Superseding Indictment. Counts 1 - 30, and 35 - 47 charged a Scheme to Deprive the United States of Money, Property and Honest Services by Wire Fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1346. Counts 31 - 33, 48, and 49 charged Bribery, in violation of 18 U.S.C. § 201(b)(1). Counts 35 through 47 charged a Scheme to Deprive the United States of Money, Property, and Honest Services Through Use of Interstate Wires, in violation of 18 U.S.C. §§ 1343 and 1346. Count 51 charged Theft of Government Property, in violation of 18 U.S.C. § 641. Counts 52 and 54 - 56 charged Obstruction of Justice, in violation of 18 U.S.C. § 1512. Count 53 charged Destruction of Records in Federal Investigations, in violation of 18 U.S.C. § 1519.

The superseding indictment charged 57 counts and contained a forfeiture notice. Counts one through 30 charge Scheme to Deprive the United States of Money, Property and Honest Services by Wire Fraud, in violation of 18 U.S.C. § 1343 and name Christopher Whitman and Shawn McCarty. Counts 31 through 33 charged Bribery, in violation of 18 U.S.C. § 201(b)(1), and name Christopher Whitman. Count 34 charged Bribery, in violation of 18 U.S.C. § 201(b)(1), and named Shawn McCarty. Counts 35 through 47 charge Scheme to Deprive the United States of Money, Property, and Honest Services Through Use of Interstate Wires, in violation of 18 U.S.C. §§ 1343 and 1346 and named Christopher Whitman and Bradford Newell. Counts 48 and 49 charged

Bribery, in violation of 18 U.S.C. § 201(b)(1), and name Christopher Whitman. Count 50 charged Bribery, in violation of 18 U.S.C. § 201(b)(1), and name Bradford Newell. Count 51 charged Theft of Government Property, in violation of 18 U.S.C. § 641 and named Christopher Whitman and Bradford Newell. Counts 52 and 54 - 57 charged Obstruction of Justice, in violation of 18 U.S.C. § 1512. Count 53 charged Destruction of Records in Federal Investigations, in violation of 18 U.S.C. § 1519. Christopher Whitman is named in counts 52 through 56 and Shawn McCarty is named in count 57.

As to the codefendants in this case, both McCarty and Newell were convicted on the same date as Christopher Whitman. McCarty was convicted of counts 4-5, 7-11, 14-15, 17-18, 22-23, 28, 30, 34, and 57. Newell was convicted of counts 35-37, and 50-51.

As to the related cases, all entered pleas of guilty. Kelli Durham entered a plea to a one count information which charged Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371. Mitchell Potts entered a plea to a one count information which charges Bribery, in violation of 18 U.S.C. § 201(b)(2). Jeffrey Philpot also entered a plea to a one count information which charges Bribery, in violation of 18 U.S.C. § 201(b)(2).

Sentencing took place on September 15, 2015 and Whitman was sentenced to serve 264 months in prison.

A notice of appeal was filed by the same firm who represented Whitman at trial, the Garland law firm, in the United States Court of Appeals for the Eleventh Circuit, docket number 15-14846 and the judgment was affirmed on April 24, 2018. A petition for writ of certiorari was filed to the United States Supreme Court, docket number 18-7440 and certiorari was denied on February 25, 2019. This motion to vacate sentence was filed on October 28, 2019.

## STATEMENT OF THE FACTS

Investigation into the present offense began in 2009 when authorities became aware of widespread fraud and theft that was occurring at the United States Marine Corps Logistics Base, at Albany, Georgia. The investigation began when authorities received a tip from a confidential informant. Agencies that participated in the inquiry into criminal activity at MCLB - Albany included Naval Criminal Investigative Services and the U.S. Defense Logistics Agency Inspector General. Authorities determined that tens of millions of dollars were fraudulently obtained from the base through several different means, involving several employees.

The MCLB at Albany, Georgia is one of two United States Marine Corps (USMC) installations within the U.S. that supports the USMC Logistics Command. MCLBAlbany's primary mission is to rebuild and repair combat support equipment to support military installations on the east coast. Much of this equipment was used in Afghanistan, Iraq, and other parts of the world by U.S. military, in defense of the U.S. and U.S. interests abroad. There are approximately 400 Marines and 3,000 civilians employed at MCLB-Albany.

The Defense Logistics Agency (DLA), a component of the U.S. Department of Defense (DOD), is a combat logistics support agency. Part of the mission of DLA is to provide the USMC with logistic, acquisition, and technical services. DLA manages the re-utilization of military equipment and provides needed items that the DOD requires to operate. These items include food, fuel, uniforms, medical supplies, spare parts, and construction equipment. In addition to the acquisition of said materials, DOD also coordinates the transportation to and from military bases and installations throughout the U.S. and the world.

Christopher Whitman was the founder, co-owner, and chief operator of United Industrial of Georgia, Inc. (ULOC), and its affiliated entity, ZMK Trucking. Mr. Whitman's companies did business with the United States Marine Corps Logistics Base, at Albany, Georgia. Mr. Whitman's co-defendants, Mitchell Potts, Jeffrey Philpot and Shawn McCarty, worked at the Base in the office that was responsible for hiring trucking companies.

Kelli Durham was an employee of Mr. Whitman's company who reported directly to Whitman. She was responsible for taking freight orders from the Base. She then either arranged for direct transportation, using ULOC trucks, or brokered the shipments to other private trucking companies. She was also responsible for billing the government and maintaining various records.

As the Presentence Report summarizes the conduct: "Christopher Whitman began doing business with the DLA, specifically the MCLB-Albany, to increase business for his trucking company. He discovered that some of the employees [namely Mitchell Potts, Jeffrey Philpot and Shawn McCarty] there were susceptible to bribery and then took full advantage of the system's weaknesses as it pertained to record keeping, good business practices and fairness."

**STATEMENT OF ADDITIONAL FACTS TO BE DEVELOPED AT AN EVIDENTIARY HEARING**

Mr. Whitman's initial action when he realized he was under investigation, was to meet with his long time attorney, Robert Margeson. Mr. Margeson and his daughter, Leigh Ann Flynn, had handled every aspect of the Mr. Whitman's legal life for many years. In April 2012 a meeting was held at Mr. Whitman's office with Chris Whitman, Kelli Durham, and Robert Margeson being present. At that meeting Mr. Margeson made contact with NCIS about the investigation. Mr. Margeson questioned Mr. Whitman and Kelli Durham on several issues with all three together during the questioning. Mr. Whitman told Mr. Margeson  about Mr. Potts and Mr. Philpot telling

5

him he had to pay money for trucking jobs, because G&S Trucking, Mercer Transportation, Landstar (Richard Williams)(Pam Anderson, who worked in same office as Mitch Potts, and she was receiving a lot of money from Richard Williams and she told Pots how to play the "game")  were paying for hauls. Mr. Margeson soon realized that his general practice  experience had not prepared him to manage a complex federal criminal case, and he consulted with an older, more experienced criminal defense attorney, James Wiggins. Mr. Wiggins was subsequently determined not to be a the right lawyer for the case.

After meeting with Mr. Wiggins, Mr. Margeson told Mr. Whitman that he needed to meet with Ed Garland. Mr. Garland traveled to Mr. Margeson's Albany, Georgia office where their initial meeting took place. Mr. Whitman was impressed with Ed Garland, and it was agreed that he would be hired for a fee of $500,000. Mr. Margeson was to receive 35 percent of Mr. Garland's fee, to the tune of $150,000. Mr. Garland subsequently received another $250,000 and then another $100,000 for representing different aspects of the charges, reportedly excluding Mr. Margeson from his percentage of the fees, about which Mr.  Margeson complained to Mr. Whitman.

The next meeting took place at the Garland Law Building in the metropolitan suburb of Buckhead, where Mr. Garland owns an office building. Present at the initial Garland Law Building meeting were Chris Whitman, Becky Whitman, Kelli Durham, Janice Singer, Don Samuel and non-lawyer staff. Details of the case were discussed and Mr. Whitman spoke freely about what he had done. The next several meetings, Kelli Durham was present and lunches were had in a restaurant within walking distance from the Garland Law Building;  present were Chris Whitman, Ed Garland, Janice Singer and Kelli Durham and others. At all times relevant to this discussion, the law firm of Thompson & Singer rented space in Ed Garland's law building at 3151 Maple Drive in Atlanta. Mr.

Garland's office was on the first floor and Thompson Singer had offices on the second floor. Prior to Ms. Singer's involvement in the Whitman case, she had worked in Mr. Garland's firm.

The facts of the case and incriminating information relayed by Mr. Whitman were discussed at those lunches. One of the topics discussed in meetings where Kelli Durham and Janice Singer were present was Mr. Whitman's dealings with Shelby Janes, Brad Newell and C.W. Smith concerning equipment. Kelli Durham had nothing to do with the equipment in her job at the Whitman company, and she only learned this information from being a participant in what should have been confidential attorney client meetings. Also a matter about which Ms. Durham had no knowledge prior to attending attorney client meetings and lunches was the Beau Kimsey DUI arrest and the scheme to set him up so he would lose his commercial drivers license. Finally, Kelli Durham, who kept a spread sheet of expenses, had no idea what those expenses were for until she attended attorney client meetings and Mr. Whitman explained those costs to Mr. Garland, Ms. Singer and Ms. Durham.

At one of the subsequent meetings at Mr. Garland's office, Janice Singer and Kelli Durham met separately, after Ms. Durham had received a target letter.

Summary of information Kelli Durham learned at attorney client meetings she did not learn through her employment with Mr. Whitman:

1. Learned about Mercer conspiracy

2. Costs on spreadsheets meaning

3. Equipment sales between Shelby Janes, Chris Whitman and C.W. Smith

4. Cash envelopes to Shawn, Jeff Philpot and Mitch Potts

5. Shawn's construction company doing work for Whitman and about doing work on Jeff Philpot's

house.

6. Coins Whitman bought for Jeff Philpot

7. Biloxi trip - Philpot and Shawn attended for Zach Whitman's bachelor party.

8. DUI they set up for Bo Kinsey

9. Mercer sent Mitch Potts on a cruise for his wedding

10. Mercer sent Mitch Potts on a hunting trip.

All of this information was information she and Janice Singer shared with the government, as the result of non-privileged meetings Garland allowed Chris to participate in and to share what should have been privileged information.

## STATEMENT OF THE ISSUES

1. Trial/appellate counsel's and other counsel's actual conflict of interest denied Mr. Whitman his Sixth Amendment right to effective assistance of counsel.

2. Trial counsel's failure to properly prepare for trial resulted in constructively denying Mr. Whitman effective assistance of counsel.

3. Trial/appellate counsel was ineffective in representing Mr. Whitman on sentencing issues.

## DISCUSSION

## 1. TRIAL COUNSEL'S ACTUAL CONFLICT OF INTEREST DENIED MR. WHITMAN HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

**The Ed Garland Conflict of Interest**. Ed Garland created a web of conflicted legal representation, through incestuous inclusion of numerous individuals in his office building, who advised Whitman family and business associates.  Mr. Garland immediately brought in the firm of Thompson Singer, Attorneys at Law,  comprised of  Douglas R. "Ron" Thompson and Janice Singer, in early June of 2012 (based on billing records received), when it became clear to him that a fallout of the case against Whitman would be tax liabilities. Thompson Singer billing records show that in 2013 the Whitman's were instructed to make the payment to Douglas R. Thompson. In the March 2014 billing, that instruction changed to make payments to Thompson Singer. See Thompson Singer billing records attached as Exhibit 4 to the Appendix.

In May 2012, the Whitman's began meeting with Mr. Garland in his offices at 3151 Maple Drive, in Buckhead. Kelli Durham rode to those attorney client meetings with Whitman, she was included in initial attorney client meetings and she attended lunches with Mr. Garland, Mr. Whitman, other attorneys in the Garland law firm and with Janice Singer and Doug Thompson, where attorney client business was discussed. Janice Singer, who was present at attorney client meetings with Whitman was asked by Mr. Garland to represent Kelli Durham, when Ms. Durham  received a target letter from the government. Ms. Singer's retainer agreement shows that she was retained to represent Kelli Durham in early 2013.  Ms. Singer's firm, Thompson Singer had been representing Whitman since early June of 2012 at the time she claims she agreed to represent government target, Kelli Durham.

9

According to Ms. Singer's sealed affidavit which was the government's Exhibit A, Ms. Singer was approached by Ed Garland about representing Kelli Durham in June 2012, since it looked like she would be a witness or a target of the government. Ms. Singer understood that Garland was representing Mr. Whitman. Ms. Singer states she was paid a "low level retainer" at that time, and she understood that Ms. Durham's legal fees would be paid by Mr. Whitman. Mr. Whitman recalls that Mr. Thompson told them at a meeting with Mr. Garland, Mr. Whitman, Mr. Thompson and Ms. Singer that this would be a conflict of interest. Mr. Whitman recalls that Mr. Garland took Mr. Thompson outside and when they returned to the office, Mr. Thompson no longer voiced an objection to the Janice Singer representation. In her affidavit Ms. Singer states she explained to Mr. Whitman and his wife, Becky, that regardless of who paid her fees, her loyalty was to Ms. Durham. A letter to that effect was not written by Ms. Singer to the Whitman's until February 4, 2013. Ms. Singer also claims in her affidavit that she did not learn of Mr. Thompson's representation of Whitman for several months, at which time she drew up the February 4, 2013 conflict letter, which she attached to her sealed affidavit. Ms. Singer, Mr. Thompson, Mr. Garland and others attended numerous lunches with Mr. Whitman and Ms. Durham, so Ms. Singer was on notice that her law partner, Mr. Thompson, was somehow involved with Chris Whitman. Ed Garland was aware of both the Ms. Singer and Mr. Thompson representations, as he referred Ms. Durham to Ms. Singer and Mr. Whitman to Thompson Singer. The Whitman's did not have the advice of independent counsel when they executed the waiver of conflict.

When Brian Whitman (brother to Chris Whitman), Mr. Whitman's children, Zach and Meghan, and father-in-law Earl Varnadoe received summons to appear to give information, Mr. Garland suggested that Mr. Whitman hire Jana Harris, an attorney in Mr. Garland's office, to

represent all of them. Mr. Whitman paid Ms. Harris $40,000 to represent them.

Finally, in her affidavit, Ms. Singer claims that she and Mr. Thompson were partners in name only and were financially separate. This statement is contradicted by the explicit billing instructions by Ron Thompson as concerning the payee on checks from the Whitmans', changing the payee from Douglas R. Thompson in 2013 to Thompson Singer in 2014. Ms. Singer represented Kelli Durham throughout the Whitman trial, in docket number13-cr-45, until her case was terminated in 2017. See attached docket.

**Joint Conflict Margeson and Garland**.  Before the government attached a consortium of rental house properties, which Mr. Whitman believed to be worth $20 million, Mr. Margeson told Mr. Garland he had a buyer for the property (they recall the son of Red Carr) for the sum of $5 million. Mr. Whitman will testify that Mr. Garland then expressed an interest in buying the properties himself, which delayed the sale of the property to anyone, and the government attached the property before either lawyer was able to complete the sale of the properties.

**The Robert Margeson Conflict of Interest**. The Margeson law firm, comprised of Robert Margeson and Leigh Ann Flynn, represented Mr. Whitman in purchasing the properties bought with money earned from his trucking business, and with the sale of those same properties to friends of Mr. Margeson. The Margeson firm represented Mr. Whitman and his family in every aspect of their legal business. Most financial crimes, upon conviction, will result in restitution or forfeiture. The sale of the properties determined by the government to be purchased through ill-gotten gains would be paid toward that financial penalty, eliminating some of the enormous debt Whitman has been ordered by this Court to pay, over $18,000, 000. Before the government could attach these properties, they were

11

sold, or attempted to be sold[1]:

**The bungled sale of the rental house consortium of properties valued at $20 million**. See above in Garland/Margeson conflict.

**The lake house property**: This property was sold through Margeson to Rusty Skalla for $325,000. Margeson told Whitman that money went to Ed Garland to be placed in escrow to pay income taxes[2].

**The Chicksaw property**: Sold to Doug Wingate for $400,000. Mr. Margeson put that money in his escrow account to be held for Mr. Whitman. When Mr. Whitman asked for the money just before trial began, Mr. Margeson told him he was keeping it for attorney fees. Mr. Margeson had already been paid the agreed upon amount, he was not a trial attorney, and Mr. Whitman never agreed to pay him an additional $400,000.

**The Cordele House**. That house sold for $400,000 and Mr. Margeson sent that money to Mr. Garland to pay income taxes.

**Money in bank account**: There was $300,000 in a Whitman bank account which was sent to Garland to pay Whitman income taxes.

---

[1]The sale of property recollections are based on Mr Whitman's memory of what he was told to do by his lawyers, what he was told about the disposition of the money by his lawyers.

[2]Copies of three checks from the Garland law firm made out to Christopher Whitman were received by Linda Sheffield on February 26, 2021. The checks were written on July 2, 2012 ($118,050), August 1, 2012 ($286,700) and August 2, 2012 ($494,000). Donna Young, an employee of the Garland firm signed the checks written on the Garland, Samuel & Loeb IOLTA Trust Account with Suntrust Bank. Ms. Young accompanied Mr. Whitman to Suntrust Bank, went inside with him and purchased checks as indicated on the front of some of the checks to pay tax obligations of various corporations and the Whitman's. According to Mr. Whitman, an approximate total of $1,025,000 was sent to the Garland firm to pay taxes. $898,750 was provided for the payment of taxes, based upon checks provided to counsel 2/26/2021. There is an overage of $126,250 which should be in the Garland firm's IOLTA account. See Exhibit 10 Appendix.

**Missing Gold**. The government has an interest in securing what they believe to be $400,000 in gold. Mr. Philpot reportedly returned gold to Mr. Whitman and some of that gold was placed in the safe at his office (which the government confiscated). The remainder of the gold was placed in a cigar box and an old coffee can, which was place in a curio cabinet in Mr. Whitman's office. Those containers were in the curio cabinet when the search was conducted by the authorities. Mr. Whitman advised counsel that the gold from those containers was not listed on the search warrant return. Mr. Whitman does not know what happened to that gold. When the search was being conducted, law enforcement was present and attorney Robert Margeson was present. Mr. Whitman advises he was not present, nor were any members of his family, at the time of the search.

**Trailer on Whitman property**. Mr. Whitman advised that Mr. Margeson sold it for an unknown sum of money and kept the money; at least Mr. Margeson did not turn the money over to Mr. Whitman. This is the trailer which was the subject of the video made by Mr. Margeson with Ms. Durham and Pappy. The trailer was loaded with equipment they referred to as unclaimed freight.

Mr. Margeson and Ms. Flynn incorporated numerous corporations in the buying and selling of the properties. The Margeson firm was paid a fee on each property transaction.

**The Douglas R. Thompson/Thompson & Singer Conflict of Interest**. According to Mr. Whitman, Mr. Thompson was the only attorney who questioned the ethical issue involving the hiring of Janice Singer to represent Kelli Durham. Mr. Thompson saw Ms. Singer in meetings, he collected money in the partnership name, changing the payment from his name only, indicating a financial partnership in the Mr. Whitman's payments to the firm. Mr. Thompson was well aware that he and Ms. Singer were representing conflicting interests.

13

An actual conflict of interest exists[3]. Had Mr. Garland and Mr. Margeson not held joint meetings with Ms. Durham and Mr. Whitman, where the extent of Mr. Whitman's criminal activities were revealed, there is a substantial probability that either the government would not have known about this activity, or that Mr. Whitman, instead of Ms. Durham, could have provided that information to the government to benefit Mr. Whitman. The sharing of that information with the lynchpin witness against Mr. Whitman surely expanded the charges against Mr. Whitman and provided Ms. Durham with the ability to ensure her value to the government, as she repeated what she (and Ms. Singer) heard in joint meetings with Mr. Whitman and his lawyers.

An actual conflict of interest existed, when Mr. Garland recommended the law firm of Thompson & Singer to represent conflicting interests (Ms. Singer to represent key government witness, Kelli Durham, and Mr. Thompson to represent Mr. Whitman with Mr. Garland), and held joint meetings with them both, sharing privileged information on Mr. Whitman's confidences with both lawyers. See Expert Report of Matthew Kaiser, attached as Exhibit 12, in support of this argument.

Multiple representation does not violate U.S. Const. amend. VI, unless it gives rise to a conflict of interest. Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has

---

[3]

In presenting a conflict of interest argument, Mr. Whitman has engaged a recognized expert in the area of conflict of interest, Matthew Kaiser of Washington, D.C., who has prepared an expert report, attached as Exhibit 12 to the Appendix, and Mr. Kaiser is prepared offer expert testimony at an evidentiary hearing. Excerpts from that report are cited at the end of this discussion.

resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where a common defense gives strength against a common attack. In order to establish a violation of U.S. Const. amend. VI, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Unconstitutional multiple representation is never harmless error. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. Mr. Whitman presented no objection at trial or on appeal, as he was represented by the same lawyer, Mr. Garland, (and Mr. Margeson), who initiated and caused the conflicts of interest. This is the first time Mr. Whitman has appeared with lawyers not involved in the conflicts of interest in all prior aspects of his representation.  In cases where an attorney seeks to represent multiple codefendants, a District Court must be allowed substantial latitude in refusing defendants' waivers of their Sixth Amendment right to conflict-free representation, not only where an actual conflict may be demonstrated before trial, but also where there is a potential for conflict which may develop into an actual conflict as the trial progresses. *Wheat v. United States*, 486 U.S. 153 (1988). In Mr. Whitman's case, the district court was not called upon to make the decision on any of the conflict issues, the same principle applies. Had the district court known of the counsel approved meetings with Mr. Whitman, Ms. Durham and Janice Singer, and the  representation of conflicting interests of Thompson & Singer, the waiver executed by Mr. Whitman in all likelihood would not have been accepted, and questions would have immediately arisen as to the ability of Mr. Garland to represent Mr. Whitman's best interests at trial, due to the

15

conflicts of interest he initiated and approved.

**The expert report (Appendix Exhibit 12) concludes by offering 4 opinions, as follows**:

**Opinion 1. The conflict between Durham and Whitman was not waivable**.

Ms. Singer accurately recognized that there was a conflict of interest between her firm's representation of Ms. Dunham and her firm's representation of Mr. Whitman. However, this conflict of interest was not waivable.

Georgia Rule of Professional Conduct 1.7(a) is clear: "A lawyer shall not represent or continue to represent a client if there is a significant risk that the . . . lawyer's duties to another client . . . will materially and adversely affect the representation of the client, except as permitted in (b)."

Rule 1.7(b) permits a representation prohibited by subsection (a) if the client gives informed consent. However, 1.7(c) says that:

> "Client informed consent is not permissible if the representation:
> 1. . . . ;
> 2. includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or
> 3. involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients."

Here, both 1.7(c)(2) and (c)(3) are met. Rule 1.7(c)(2) is met because the matters are substantially related – Mr. Thompson's representation of Mr. Whitman was a part of Mr. Garland's representation of Mr. Whitman in his criminal case and necessarily involved the same nucleus of facts as the criminal case that Ms. Singer represented Ms. Dunham in. And Ms. Dunham's position was that Mr. Whitman had committed a crime. Mr. Whitman's position was that he hadn't. It is difficult to imagine a starker difference in position.

16

As discussed below, because Mr. Garland arranged for Mr. Thompson and Ms. Singer to represent Mr. Whitman and Ms. Dunham—in essence, asking two partners at one firm to take on impermissibly conflicted representations—he is the architect of this unwaivable conflict of interest.

Rule 1.7(c)(3) is also met. No reasonable lawyer would think that Thompson & Singer could represent both a cooperating witness against a person and the person himself. Comment 8 to Rule 1.7(c)(3) states the general rule: "Ordinarily, a lawyer may not act as advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated."

As a result, Mr. Whitman and Ms. Dunham could not give informed consent to the waiver of the conflict of interest that Ms. Singer sought. Because they could not provide informed consent to the joint representation, the conflict waiver that Ms. Singer sought was not effective.

### Opinion 2. The Conflict Is Imputed to the Entire Firm

The unwaivable conflict of interest between Mr. Whitman and Ms. Dunham applies to the entire firm of Thompson & Singer, not merely to each lawyer separately.

Ms. Singer's attempt to assert that the conflict of interest applied to her alone, and not to her firm is not consistent with the Georgia Rules of Professional Conduct. Rule 1.10(a) is clear: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7: Conflict of Interest . . ." As is discussed above, the conflict of interest here arises out of Rule 1.7; the conflict is a conflict for the entire firm, not merely the individual lawyers alone. Comment 6 to the Rule puts it well: "a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client."

Ms. Singer asserts that she and Mr. Thompson were not "traditional partners." Affidavit at 5. It is not clear what that means. What is clear, from their letterhead, their shared office space, and

their shared firm name, is that they held themselves out to the public as a law firm. Comment 1 to Rule 1.10 squarely addresses – and rejects – Ms. Singer's view that because they were not a "traditional" law partnership there was no conflict: "two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for the purposes of the rules."

Thus, because Thompson & Singer held itself out to the world as a law firm, the conflict of interest applied to each lawyer in the firm.

### Opinion 3: If Mr. Garland Shared Mr. Whitman's Client Confidences with Ms. Singer, that Violates a Number of Duties

For this opinion, I have been asked to assume that when Mr. Whitman drove to Atlanta to meet with Mr. Garland, he brought Ms. Dunham with him. I have been asked to further assume that Mr. Garland would invite Ms. Singer, and others, into meetings with Mr. Whitman and Ms. Dunham where he would discuss Mr. Whitman's criminal case. Further, Mr. Whitman would speak at these meetings and provide information that would be privileged, was incriminating, and allowed Mr. Dunham to have access to additional information that she ultimately shared with the government. The information that was provided at these meetings is set out in the statement of factual assumptions above.

If true, this would be a serious breach of Mr. Garland's duty to safeguard Mr. Whitman's client confidences and his duty to provide competent representation to Mr. Whitman. A competent lawyer would know not to discuss attorney client confidences and attorney work product in front of a third person – be it another lawyer or a witness in the case. A lawyer engaging in such conduct

violates Rule 1.1's duty of confidence as well as Rule 1.6's duty to keep confidential and secret information confidential and secret.

**Opinion 4. If Mr. Garland Permitted His Client to Share Would-Be Confidential Information with Others, He Faced a Personal Interest Conflict When He Advised Mr. Whitman to Sign Ms. Singer's Conflict Waiver**

The entanglements between Mr. Garland, Mr. Thompson, and Ms. Singer created a conflict of interest for Mr. Garland as well.

Mr. Garland referred Mr. Whitman to Mr. Thompson as a client. Mr. Garland knew that Mr. Thompson was at a law firm with Ms. Singer; they were tenants in the office building Mr. Garland owned. Mr. Garland also invited Ms. Singer – and Ms. Dunham – to sit in meetings with him and his client as they discussed the case.

When Ms. Singer wrote the letter that purported to be a conflict waiver letter, described and discussed above, Mr. Garland should have advised his client not to sign the document. That conflict waiver letter allowed Ms. Singer – who now had Mr. Whitman's confidential information – to represent Ms. Dunham as she took that confidential information to the government to be used against Mr. Whitman.

Georgia Rule 1.7 makes it clear that a conflict of interest emerges if "lawyer's own interests" would conflict with a client's interests. Rule 1.7(a). As Comment 6 says, "[i]f the propriety of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client objective advice."

Here, Mr. Garland's conduct was improper. He intentionally and knowingly discussed client confidences in front of Ms. Singer and Ms. Dunham, which is a violation of his duties to safeguard Mr. Whitman's secrets and a violation of his duty to provide competent representation to Mr.

Whitman. Mr. Garland encouraged his client to share confidential information about his case with others. Through those meetings, a woman who was not his client gained substantial knowledge about the case that was then used against Mr. Whitman when she was a cooperating witness.

Because Mr. Garland violated his duties to Mr. Whitman by permitting others to be at the meetings he had with Mr. Whitman, when he advised Mr. Whitman about whether to execute the conflict of interest letter he was laboring under a conflict between keeping it from being clear to Mr. Whitman how very bad his judgment was to have Ms. Singer and Ms. Dunham at the meetings and his duty to Mr. Whitman to advise him not to waive the conflict.

Moreover, my understanding is that Mr. Garland referred Ms. Dunham to Ms. Singer as counsel. Because Ms. Singer was a participant in what should have been privileged conversations between Mr. Garland and Mr. Whitman, Mr. Garland should not have made such a referral.

As a result of the conflicts of interest in the Whitman case, and the prejudice resulting directly from those conflicts of interest, the judgment of conviction must be vacated and a new trial ordered.

**ISSUE 2. TRIAL COUNSEL'S FAILURE TO PROPERLY PREPARE FOR TRIAL RESULTED IN CONSTRUCTIVELY DENYING MR. WHITMAN EFFECTIVE ASSISTANCE OF COUNSEL.**

Hoping the case would be resolved by a plea agreement, when it came time for trial, an economic extortion defense was utilized by the Garland firm: Garland claimed  Whitman was extorted and therefore his payment of money to Jeffrey Philpot and Michael Potts was justified. Unfortunately for Whitman, Garland's "defense" did not differentiate between a bribery or a gratuity conviction. If Whitman was extorted or experienced economic coercion, under the law in the Eleventh Circuit, he could still be convicted of either bribery or gratuity charges. See Trial Transcript,

Volume 16, page 25 et seq. Exhibit 1 Appendix. Had Garland defended on the theory of this was a gratuity and not a bribe, a conviction of gratuity would have meant a much lesser sentence upon conviction. There was no alternative defense of gratuity versus bribery offered by Garland.

On appeal, Garland took issue with the fact theat the trial court declined to give the gratuity instruction, when he had not raised this issue before the jury.  The gratuity instruction was first mentioned at the charge conference, and the discussion is attached. See Exhibit 2, Appendix.  The Whitman opinion states that the employees handing out trucking jobs never discussed with each other the specifics of their individual arrangements with Mr. Whitman. The opinion also states that Mr. Whitman defended himself by claiming he was extorted, "[t]he money he paid was paid because [Potts and Philpot] threatened to blackmail him and to eliminate him as a carrier."  Philpot, at trial, testified that Philpot "would need to remind Whitman to pay him."

At the charge conference, Mr. Whitman's counsel raised - for the first time - the possibility of a new theory of defense: that he gave illegal gratuities, not bribes, to the government employees. Whitman's counsel stated, "Your Honor, I have another matter that I just didn't snap to. The Defendant Whitman would request the lesser included offense charge of gratuity."  The Court responded "there is little, if any evidence in the record of payments being made as gratuit[ies]" And because the jury would be asked "to deliberate on a matter that[] [is] not really clearly in the case, " the instruction "would be more confusing that it would be of aid [] [to] the jury in its deliberation." See Whitman opinion attached with highlighted sections. Exhibit 11, Appendix.

Taken from the 11th Circuit opinion in *United States v. Whitman*, 887 F. 3d 1240 (11th Cir. 2018), in relevant part, the Eleventh Circuit addresses Mr.  "*Whitman's last minute request to instruct the jury about paying illegal gratuities.*" (Emphasis added)

The only element necessary to prove the greater offense of official-act bribery but not necessary to prove the lesser-included offense of giving illegal gratuities is the existence of a "quid pro quo—a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of Cal*., 526 U.S. 398, 404-05, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999). Official-act bribery prohibits "directly or indirectly, corruptly giv[ing], offer[ing] or promis[ing] anything of value to any public official or person who has been selected to be a public official . . . with intent . . . to influence any official act." 18 U.S.C. § 201(b) (emphasis added). In contrast, the gratuities provision prohibits "directly or indirectly giv[ing], offer[ing], or promis[ing] anything of value to any [past, present, or future] public official, for or because of any official act performed or to be performed by such [official]." 18 U.S.C. § 201(c) (emphasis added).

The two statutory provisions contain distinct intent elements. See *Sun-Diamond*, 526 U.S. at 404-05. Official-act bribery requires the "intent 'to influence' an official act," which means that there must be a "quid pro quo," or "a specific intent to give or receive something of value in exchange for an official act." Id. at 404-05. But giving illegal gratuities "requires only that the gratuity be given or accepted 'for or because of' an official act." Id. at 404. So "[a]n illegal gratuity . . . may constitute merely a reward" for some future or past act by the official. Id. at 405.

The Court declined to] decide whether giving illegal gratuities is a lesser-included offense of bribery. At least one circuit has held, over dissent, that it is. *United States v. Alfisi*, 308 F.3d 144, 152 & n.6 (2d Cir. 2002); see also id. at 158-61 (Sack, J., dissenting). The government argues that we should adopt the reasoning of the dissent in that decision and hold that, although giving illegal gratuities is a subset of official-act bribery, it is not a lesser-included offense of all three of the alternative forms of bribery, 18 U.S.C. § 201(b). We need not resolve that issue of first impression

in this Circuit because Whitman has not established that the evidence at trial would have permitted the jury to acquit him of bribery and convict him of giving illegal gratuities.....................see *United States v. Colacurcio*, 659 F.2d 684, 690 (5th Cir. Unit A Oct. 1981) ("*[A]ppellants' insistence that extortion can be a defense to bribery is incorrect. . . . [E]ven if the appellants were subjected to extortion, they c[ould] still be convicted on the bribery charge[s].*"[Emphasis added] (internal citation omitted))............So the dispute  about whether Whitman was extorted would not have "permit[ted] the jury rationally to acquit [him] of [bribery] and convict him of [giving illegal gratuities]." *Williams*, 197 F.3d at 1095. If the jury had believed that he was extorted, it would have acquitted him of both offenses.

The Eleventh Circuit, in its opinion in Mr. Whitman's case, has effectively shown that the defense offered by Mr. Garland was not a defense to bribery in the Eleventh Circuit, and that Mr. Garland's belated "snap to" request for a gratuity charge, as jury instructions were being proposed, had no support in the record.

As a result of not researching the legal argument of economic coersion/extortion being a defense to bribery, trial counsel offered a defense which was not a lawful defense in the Eleventh Circuit. Trial counsel admitted that he had not previously considered a gratuity defense. Mr. Garland "just didn't snap to" considering the gratuity defense, yet sought the jury instruction at the last minute. Had a gratuity defense been part of the defense, and had the jury accepted it, the sentence of Whitman would have been substantially less, upon conviction.

**ISSUE 3. TRIAL/APPELLATE COUNSEL WAS INEFFECTIVE IN REPRESENTING MR. WHITMAN ON SENTENCING ISSUES.**

I.       Failure to seek a continuance resulting resulted in an artificially high (and incorrect) Specific

Offense Characteristic of 22, rather than 20 (for a difference of two levels); § 2B1.1; PSR (DE 214) at ¶ 41.

The United States Sentencing Guidelines ("USSG") are generally amended each year, and those typically take effect in early November of each year. The proposed guideline changes are published and discussed ahead of time, such that the bar, particularly the federal criminal defense bar, can anticipate the amendments and use to their clients' benefit.

In the instant case, the USSG section that gave the gave the Specific Offense Characteristics enhancement for the loss amount was USSG § 2B1.1(b). In 2014, it provided for a 22 level increase when the loss amount was more than $20,000,000. USSG § 2B1.1(b)(1)(L). Less than two months after the sentencing hearing in the instant case, the amount of loss required for the 22 level increase was raised to "more than $25,000,000." USSG Amendment 791; § 2B1.1(b)(1)(L). This amendment, which would have been a huge benefit to Mr. Whitman, was to take effect on November 1, 2015. The sentencing hearing for Whitman was held on September 10, 2015.

Incredibly, while Mr. Whitman's trial counsel made a reference to the amendment at sentencing, he neither requested a continuance of the sentencing hearing (so that the sentencing could take place *after* the amendment, nor did he ask for a downward variance due to the impending change. (Sentencing hearing transcript, pp 21-22.)[4] Had trial counsel done either and assuming the District Court granted the request, it would have resulted in a 20 level increase, not a 22 level increase under 2B1.1. As trial counsel acknowledged at sentencing, the argument (about whether the correctly calculated loss amount was just above or just below $20,000,000) would be moot once the

---

[4]     Trial counsel said that it changed in 20 days, but it was actually approximately one month and 20 days.

amendment (raising the loss amount threshold from $20,000,0000 to $25,000,000) took effect.

Specifically, in the instant case, the Presentence Investigation Report ("PSR") recommended a 22 level increased based on the loss amount under §2B1.1 of $21,296,655.  (¶ 41 of DE 214).  The District Court adopted that finding.  This critical finding was part of the calculus that caused Mr. Whitman to have an Adjusted Offense Level of 46.  Had trial counsel requested (and obtained) a continuance, then the Adjusted Offense Level would have been a 44.[5]

The United States Court of Appeals for the District of Columbia ruled that the failure of trial counsel to seek a continuance of a sentencing hearing when the Fair Sentencing Act was about to take effect constituted ineffective assistance of counsel.  *United States v. Abney*, 812 F.3d 1079 (D.C.Cir. 2016).  "The failure of Abney's counsel to seek a continuance of sentencing was objectively unreasonable and therefore constitutionally deficient."  *Id*. at 1088.

> Abney's new counsel - a federal public defender - in seeking a reduction of sentence "couldn't find any other case like [Abney's] *because frankly most people were continuing the sentences until after [the FSA became effective]*." [Emphasis added.] Mot. Hr'g Tr. at 14 (April 9, 2013).  The prosecutor's comments regarding the defense Bar were similar.  *Id*. at 4.  Yet, counsel for Abney failed to

---

[5]     Based on counsel's experience with the Judges in the Middle District of Georgia, the Judges are conscientious, deliberate and intentional in trying to make the correct ruling and give Defendants and their counsel wide latitude and the benefit of the doubt in making reasonable requests in order to ensure that a Defendant is sentenced fairly.  In short, the undesigned counsel feel very strongly that a continuance based on this reason would have been granted.

seek a continuance of sentencing.   In these circumstances, that
amounted to a failure to provide "reasonable effective assistance."
*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052."[6]

Had trial counsel not missed this opportunity to continue the sentencing hearing in order for

his client to benefit from the amendment to the USSG, the resulting Specific Offense Characteristics

increase would have only been a 20 level increase, which would have resulted in total offense level

of 44.  While the Total Offense Level would still be a 43 (due to that being the highest offense level

there is), since the Court varied down to a sentence of 264 months, which with a Criminal History

Category of I falls into a Level 38 (235 - 293 months) or 39 (262 - 327 months), Mr. Whitman

would/should get the benefit of two levels below that, which would have put him at a Level 36 (188

- 235 months) or Level 37 (210 - 262 months).  Either way he would have gotten a significantly

lower sentence.

II.     Failure to properly argue and apply the loss calculation amount. Specific Offense
        Characteristic of 22, rather than 20 (for a difference of two levels); § 2B1.1;  PSR
        (DE 214) at ¶ 41.

As to this issue, trial counsel made the argument that the loss was incorrectly calculated but

failed to argue that the PSR was mis-applying a guideline to include the profit into the loss

calculation.  The loss amount, as calculated by the District Court included what ULOC's legitimate

profit would have been according to the PSR, said legitimate profit amount being $2,840.242.  (DE

214, ¶ 31) The Addendum to the PSR reads that this should be included in the loss amount because

of Commentary Note 3 in the commentary to USSG § 2C1.1.  However, this Note clearly reads that

it is "for purposes of subsection (b)(2)" of § 2C1.1, whereas the loss calculation at issue is

determined by USSG § 2B1.1, not § 2C1.1.  Failure to make this distinction is ineffective assistance

---

[6]     *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

of counsel under *Strickland v. Washington*,[7] and resulted in an incorrect, artificially-high guidelines calculation by the District Court.

---

[7]     *See*, Footnote 3.

## REQUEST FOR EVIDENTIARY HEARING

To be entitled to an evidentiary hearing, a movant must allege facts that, if true, would prove he is entitled to relief. See *Hernandez v. United States*, 778 F.3d 1230, 1234 (11th Cir. 2015). A movant is entitled to an evidentiary hearing on his § 2255 motion only if he presents "independent indicia of the likely merit of [his] allegations." *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013). "[B]are, conclusory allegations unsupported by other indicia of reliability in the record, do not compel a federal district court to hold an evidentiary hearing." *Ross v. Estelle*, 694 F.2d 1008, 1012 n.2 (5th Cir. 1983); accord *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (noting that "[i]f the defendant produces independent indicia of the likely merit of her allegations, typically in the form of one or more affidavits from reliable third parties, she is entitled to an evidentiary hearing on the issue"); *United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980) (noting that mere conclusory allegations are not sufficient to support a request for an evidentiary hearing).

## CONCLUSION

WHEREFORE, the following relief is respectfully requested:

1) That an evidentiary hearing be ordered; or, in the alternative,

2) That the motion to vacate sentence be GRANTED.

This 3rd day of March, 2021.

Respectfully submitted,
/s/ *Linda S. Sheffield*

_____
LINDA S. SHEFFIELD
GA BAR NO. 639725

Post Office Box 682136
Marietta, GA 30068
(770) 671-1234 Office
(404) 372-0666 Mobile
lindasheffield@gmail.com

/s/ *Robert R. McLendon*, *IV*

_____
ROBERT R. MCLENDON, IV
GA BAR NO. 497555

214 Court Square, 2nd Floor
Blakely, GA 39823
229-723-2635 Office
229-723-2007 FAX
robmclendon4@hotmail.com

/s/ *Justin Arnold*

_____
JUSTIN ARNOLD
GA BAR NO. 153007

416 W. Lamar Street
Americus, GA 31709
229-389-2045 Office
jarnold@arnoldhooks.com

## CERTIFICATE OF SERVICE

I, LINDA S. SHEFFIELD, hereby certify that a copy of Christopher Whitman's **SUPPLEMENTAL**

**BRIEF IN SUPPORT OF 28 U.S.C. §2255 MOTION** has been served through the ECF system on

parties subscribing to electronic filing.

This 3rd day of March,  2021.

/s/ *Linda S. Sheffield*