[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

No. 15-14846

D.C. Docket No. 1:14-cr-00001-WLS-TQL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER WHITMAN,
SHAWN MCCARTY,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Georgia

(April 24, 2018)

Before WILLIAM PRYOR and JULIE CARNES, Circuit Judges, and ANTOON,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

This appeal from convictions of bribery, wire fraud, theft, and obstruction involving government contracts presents two questions: (1) whether the district court abused its discretion when it declined to instruct the jury about the offense of giving illegal gratuities as a lesser-included offense of bribery; and (2) whether the district court clearly erred when it determined that one of the defendants was responsible for the entire loss amount attributable to the criminal scheme. Christopher Whitman, the owner of a trucking company, United Logistics, bribed Shawn McCarty and two other employees of the federal Defense Logistics Agency to steer transportation contracts to and increase the profits of United Logistics. Whitman and McCarty were convicted and sentenced for their roles in committing multiple crimes, including wire fraud and bribery. Whitman argues that the district court abused its discretion when it refused to instruct the jury about giving illegal gratuities as a lesser-included offense of bribery. But the district court did not abuse its discretion because the trial involved no dispute that would have allowed the jury to convict Whitman of the lesser charge while acquitting him of bribery. Whitman argued at trial an exculpatory defense that, if believed, would have required the jury to acquit him of both charges. McCarty argues that the district court erred when it calculated his Sentencing Guidelines range using the total loss amount caused by all four schemers. But a defendant may be held responsible for all losses caused by a jointly undertaken criminal activity, and the district court did

not clearly err when it inferred that McCarty agreed to join a scheme involving Whitman and the other two government employees. We affirm Whitman's conviction and McCarty's sentence.

## I. BACKGROUND

For about four years, Christopher Whitman orchestrated a scheme that defrauded the United States of more than $15 million. In 2008, Whitman founded a trucking company called United Logistics, and he later bribed three employees of the Defense Logistics Agency on a Marine Corps base to use his trucking company to ship military equipment around the country. Whitman bribed Mitch Potts, the office supervisor, Jeffrey Philpot, a transportation assistant, and Shawn McCarty, another transportation assistant.

Because the Department of Defense hired an outside company, Menlo, to book shipment carriers, the four schemers devised shipment requirements that all but guaranteed that United Logistics would receive assignments. For example, Philpot delayed making requests and required same-day pickups to force Menlo representatives to assign the shipments to a local carrier. A Menlo representative testified that one request gave the company a lead time of ten minutes, "which is virtually impossible" to honor. Philpot also required the use of certain trailers because United Logistics had more of those trailers than any other carrier. He

testified that he "couldn't guarantee the business would go [to United Logistics], but it was, you know, most likely."

Yet Whitman rarely, if ever, satisfied the special requirements the employees imposed. Although Whitman instructed his assistant to accept every request from Menlo, United Logistics owned only two trucks. Whitman would regularly send one of the two trucks to pick up the shipments and transport them back to his yard. His assistant would then hire other trucking companies to handle the shipments without complying with any expedite, special-equipment, or other restrictive requests.

The four schemers also used tactics to boost the profits of United Logistics. Philpot explained that he "short load[ed]" trucks by "[b]reaking . . . shipment[s] down into . . . smaller shipment[s]" so that the government was forced to "order more trucks than w[ere] actually required." Whitman then reloaded the shipments into fewer trucks once he got them back to his yard and billed the government for more trucks than he actually used. The evidence also established that McCarty once contracted with United Logistics to ship a single pallet of elastic cord from Albany, New York, to Canada for a total cost of more than $12,000. Because the shipment was designated "exclusive use," no other cargo could accompany the pallet even though it filled only about one-fiftieth of the space in a single trailer.

4

In exchange for steering profitable contracts to United Logistics, Whitman paid the government employees in cash and goods. For example, Whitman paid Potts $5,000 to $6,000 in cash-filled envelopes "monthly as long as [they] were doing good work," gave him gift cards to restaurants, and bought a house from him. Whitman initially paid Philpot "[a]nywhere from $1,000 up to $5,000" in cash "[a]t least two or three times a week," and later wrote checks for "items [Philpot] wanted" because that was "more convenient for him." He also paid a construction company owned by McCarty to make improvements to Philpot's home. And Whitman bought McCarty multiple cars, let McCarty live in one of his houses rent-free for a year and a half, and treated McCarty and Philpot to a bachelor party where he gave each of them money to gamble.

Although the employees never discussed with each other the specifics of their individual arrangements with Whitman, they knew about the criminal conduct of their colleagues. Whitman told Potts that he "had [McCarty] working for him" and that he was "paying him to get [him] as many loads as possible." Because Philpot was McCarty's supervisor, he frequently reviewed McCarty's work and identified fraudulent activity, like short loading, but failed to take any corrective action. Philpot testified that he "figured [McCarty] was doing pretty much the same thing [he] was doing" and that "[he] did not want to get him in trouble, and [he] didn't want [him]self to get in trouble either."

In 2012, agents from the Naval Criminal Investigative Service informed Potts and Philpot that they were under criminal investigation because of their relationship with Whitman. The two employees left the military base to meet with each other, and Philpot called McCarty "to give him a heads up." Whitman later joined the meeting and told Philpot and Potts to "make sure [their] phones [we]re clear."

McCarty, Potts, and Philpot met with each other several times as the investigation progressed to "touch base, [to] see if anybody had heard anything, [and to] try to find out what was going on." At one meeting, Philpot told McCarty that he was planning to meet with investigators to discuss his role in the scheme. McCarty responded that "all they had on him was a four-wheeler and a Mustang, and he wasn't going to prison for that." At another meeting, Whitman advised Potts and Philpot, "[T]he fish that don't open his mouth don't get hooked." Unpersuaded, Potts and Philpot agreed to cooperate with the government.

At trial, ==Whitman defended himself by arguing that he was extorted.== He contended that "[t]he money he paid was paid because [Potts and Philpot] threatened to blackball him and to eliminate him as a carrier." In his opening statement, Whitman's counsel stated, "[Whitman] didn't have a corrupt intent to bribe. And that is [his] defense." When he cross-examined Philpot, counsel asked if he told investigators that he "threatened Whitman that [he] would turn him off."

6

During his examination of an agent who interviewed Philpot, he asked whether Philpot "disclose[d] that there were instances when Whitman was a little slow in compensating him," that Philpot "would need to remind Whitman to pay him," and that he "threatened Whitman that he would, quote, turn him off if Whitman did not continue paying him." And in his closing argument, counsel reiterated that it was his "position" that "Whitman [wa]s the victim of extortion by two clearly corrupt government officials." He stated that "Whitman had to pay to keep doing business" and that "the government ha[d] not carried its burden of showing beyond a reasonable doubt by trustworthy evidence that the[] payments were not the result of extortion."

Whitman's proposed jury instructions also reflected his defense of extortion. Whitman's counsel requested that the district court instruct the jury about the definition of "corruptly" and the defense of economic coercion. For example, he asked that the district court stress that "the defendant would not be guilty of the offense of bribery if he paid money to the federal official, but did so as a result of coercion, and not with a corrupt motive."

At the charge conference, Whitman's counsel raised—for the first time—the possibility of a new theory of defense: that he gave illegal gratuities, not bribes, to the government employees. Whitman's counsel stated, "Your Honor, I have another matter that I just didn't snap to. The Defendant Whitman would request the

7

lesser-included offense charge of gratuity." Counsel argued that instead of convicting Whitman of bribery, the jury "could find that there was not a specific purpose or—we just talked about specific purpose 'for this, for those,' and all of that. They could find it wasn't for that. It was just a payment." The government and two of Whitman's co-defendants, including McCarty, opposed the request, and after a short recess to consider the argument, the district court decided not to give the instruction. It stated that "there is little, if any evidence in the record of payments being made as gratuit[ies]." And because the jury would be asked "to deliberate on a matter that[] [is] not really clearly in the case," the instruction "would be more confusing than it would be of aid[] [to] the jury in its deliberation."

The jury convicted Whitman of 43 counts of wire fraud, five counts of bribery, one count of theft of government property, four counts of obstruction of justice, and one count of obstructive destruction of records. And the district court sentenced him to 264 months of imprisonment, restitution totaling $18,860,313.75, a $5,400 assessment, and three years of supervised release.

The jury convicted McCarty of 15 counts of wire fraud, one count of bribery, and one count of obstruction of justice. At his sentencing, the district court calculated his Sentencing Guidelines range using the loss amount caused by all four schemers. It stated that "[a] loss amount as to Defendant McCarty of

$17,543,430.45 in the [district] [c]ourt's opinion [wa]s supported by a preponderance of the evidence." It acknowledged McCarty's argument that he was personally responsible for a far smaller loss amount, but it explained that "under a reasonable interpretation of the charges as . . . argued by the government and as the jury considered," he was "involve[d] in a scheme, and th[e] scheme center[ed] around the Defendant Whitman." It ruled that McCarty was "accountable" for the conduct of other participants in the scheme, even though the government did not charge a conspiracy and he was "not specifically and discretely found guilty . . . by the jury" of the other schemers' conduct. The district court sentenced him to 120 months of imprisonment, restitution totaling $15,410,151.55, a $1,700 assessment, and three years of supervised release.

## II. STANDARD OF REVIEW

Two standards govern our review of this appeal. We review a decision not to give a requested instruction for abuse of discretion. *United States v. Gutierrez*, 745 F.3d 463, 470 (11th Cir. 2014). "[W]e will leave undisturbed a district court's ruling unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Arthur v. Thomas*, 739 F.3d 611, 628 (11th Cir. 2014) (quoting *Ameritas Variable Life Ins. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005)). And we review a finding of amount of loss for clear error. *See United States v. Siegelman*, 786 F.3d 1322, 1333 (11th Cir. 2015). We must affirm

9

the finding if it is "plausible in light of the record viewed in its entirety." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that the district court did not abuse its discretion when it refused Whitman's last-minute request to instruct the jury about paying illegal gratuities because Whitman argued an exculpatory defense that, if believed, would have required the jury to acquit him of both bribery and giving illegal gratuities. Second, we explain that the district court did not clearly err when it calculated McCarty's loss amount.

### A. *The District Court Did Not Abuse Its Discretion when It Refused To Give a Lesser-Included-Offense Instruction on Giving Illegal Gratuities.*

Whitman argues that the district court erred when it refused to instruct the jury about giving illegal gratuities as a lesser-included offense of bribery. Federal Rule of Criminal Procedure 31(c) provides that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." Although providing an instruction on a lesser-included offense often aids the prosecution in obtaining a conviction on, at least, one charge, "it is now firmly established that Rule 31(c)'s provision for lesser offense instructions benefits the defendant as well." *Schmuck v. United States*, 489 U.S. 705, 717 n.9 (1989). It "protects the defendant" because "where the jury suspects that the defendant is plainly guilty of *some* offense, but one of the elements of the charged offense remains in doubt, . . . the jury will likely

fail to give full effect to the reasonable-doubt standard" and "resolv[e] its doubts in favor of conviction" if the district court does not give the instruction. *Id.*

To establish that the district court abused its discretion, Whitman must satisfy a two-part test. *United States v. Williams*, 197 F.3d 1091, 1095 (11th Cir. 1999). "First, he must show that the charged offense encompasses all of the elements of the lesser offense (the 'elements' test)." *Id.* "Second, he must establish that the district court abused its discretion in failing to give the instruction" because "the evidence would permit the jury rationally to acquit the defendant of the greater, charged offense and convict him of the lesser." *Id.*; *see also Carter v. United States*, 530 U.S. 255, 261 n.3 (2000). We have explained that "[a]bsent any evidence to support the bare assertion of [a defendant's] lawyer" that the government failed to prove an element of the greater offense, "the trial court [i]s not required to instruct the jury about lesser included offenses." *United States v. Tisdale*, 817 F.2d 1552, 1554 (11th Cir. 1987); *see also Gutierrez*, 745 F.3d at 470. The only element necessary to prove the greater offense of official-act bribery but not necessary to prove the lesser-included offense of giving illegal gratuities is the existence of a "*quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999). Official-act bribery prohibits "directly or indirectly, corruptly giv[ing], offer[ing] or promis[ing] anything of

11

value to any public official or person who has been selected to be a public official . . . with intent . . . *to influence* any official act." 18 U.S.C. § 201(b) (emphasis added). In contrast, the gratuities provision prohibits "directly or indirectly giv[ing], offer[ing], or promis[ing] anything of value to any [past, present, or future] public official, *for or because of* any official act performed or to be performed by such [official]." 18 U.S.C. § 201(c) (emphasis added).

The two statutory provisions contain distinct intent elements. *See Sun-Diamond*, 526 U.S. at 404–05. Official-act bribery requires the "intent 'to influence' an official act," which means that there must be a "*quid pro quo*," or "a specific intent to give or receive something of value *in exchange* for an official act." *Id.* at 404–05. But giving illegal gratuities "requires only that the gratuity be given or accepted 'for or because of' an official act." *Id.* at 404. So "[a]n illegal gratuity . . . may constitute merely a reward" for some future or past act by the official. *Id.* at 405.

We need not decide whether giving illegal gratuities is a lesser-included offense of bribery. At least one circuit has held, over dissent, that it is. *United States v. Alfisi*, 308 F.3d 144, 152 & n.6 (2d Cir. 2002); *see also id.* at 158–61 (Sack, J., dissenting). The government argues that we should adopt the reasoning of the dissent in that decision and hold that, although giving illegal gratuities is a subset of official-act bribery, it is not a lesser-included offense of all three of the

alternative forms of bribery, 18 U.S.C. § 201(b). We need not resolve that issue of first impression in this Circuit because Whitman has not established that the evidence at trial would have permitted the jury to acquit him of bribery and convict him of giving illegal gratuities.

Whitman argued at trial that he was the victim of extortion and, as a result, lacked the intent necessary to support a bribery conviction, but "[w]hen a defendant relies on an exculpatory defense that, if believed, would lead to acquittals on both the greater and lesser charges, it is no abuse of discretion to refuse to instruct the jury on a lesser included offense." *United States v. Brown*, 26 F.3d 119, 120 (11th Cir. 1994). The parties do not dispute for the purpose of this appeal that economic coercion is a complete defense both to bribery and to giving illegal gratuities, and the district court instructed the jury that economic coercion was a complete defense to the charge of bribery. *But see United States v. Colacurcio*, 659 F.2d 684, 690 (5th Cir. Unit A Oct. 1981) ("[A]ppellants' insistence that extortion can be a defense to bribery is incorrect. . . . [E]ven if the appellants were subjected to extortion, they c[ould] still be convicted on the bribery charge[s]." (internal citation omitted)). In this posture, we will assume without deciding that the parties' assumptions are correct. So the dispute about whether Whitman was extorted would not have "permit[ted] the jury rationally to acquit [him] of [bribery] and convict him of [giving illegal gratuities]." *Williams*,

13

197 F.3d at 1095. If the jury had believed that he was extorted, it would have acquitted him of both offenses.

### B. The District Court Did Not Clearly Err when It Calculated McCarty's Sentencing Guidelines Range Using the Loss Amount Caused by All Participants in the Jointly Undertaken Criminal Scheme.

Because the district court ruled that McCarty joined a criminal scheme, it calculated his Sentencing Guidelines range using the approximately $17.5 million loss caused by all participants in the jointly undertaken scheme. McCarty maintains that this ruling was clearly erroneous because the actions of the other government employees were taken independently and were not the product of any criminal agreement under the Sentencing Guidelines. *See* United States Sentencing Guidelines Manual § 1B1.3(a)(1)(B) (Nov. 2015). He asserts that the government employees acted "independently and secretly even between each other[,] behind closed doors even in the same office." We disagree.

We review a loss-amount determination for clear error and must affirm the finding by the district court if it is "plausible in light of the record viewed in its entirety." *Siegelman*, 786 F.3d at 1333 (quoting *Anderson*, 470 U.S. at 574). The government bears the burden of establishing "the pertinent facts by a preponderance of the evidence." *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015). But a district court "need only make a reasonable estimate of the loss, given the available information." *Id.* (quoting *United States v. Barrington*, 648

14

F.3d 1178, 1197 (11th Cir. 2011)). And because "[d]istrict courts are in a unique position to evaluate the evidence relevant to a loss determination," we must give their determinations "appropriate deference." *Id.*

The Guidelines permit a district court to hold participants in a "jointly undertaken criminal activity" responsible for the "acts and omissions of others"—even if the government did not charge a conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Sammour*, 816 F.3d 1328, 1340 (11th Cir. 2016). The "acts and omissions" must be "within the scope of the jointly undertaken criminal activity," "in furtherance of" the activity, and "reasonably foreseeable in connection with" the activity. U.S.S.G. § 1B1.3(a)(1)(B). To determine the "scope of the defendant's agreement" to participate in a jointly undertaken criminal scheme, the district court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* § 1B1.3, cmt. n.3(B). A defendant's "[m]ere awareness" that he was part of a larger scheme "is alone insufficient" to show that another individual's criminal activity was "within the scope of [the defendant's] jointly undertaken criminal activity." *United States v. Presendieu*, 880 F.3d 1228, 1246 (11th Cir. 2018). But actions that suggest that the defendant was actively involved in a criminal scheme permit the inference that the defendant agreed "to jointly undertake" that scheme. U.S.S.G. § 1B1.3, cmt. n.3(B); *see, e.g., United States v. Nerey*, 877 F.3d 956, 978

15

(11th Cir. 2017). For example, an implicit agreement may be inferred if, even though "the various participants in the scheme acted on their own behalf, each of the participants knew each other and was aware of the other's activities, and they aided and abetted one another by sharing" information necessary for the operation of the scheme. *United States v. Hunter*, 323 F.3d 1314, 1322 (11th Cir. 2003) (discussing *United States v. Hall*, 996 F.2d 284 (11th Cir. 1993)).

The record permitted the district court to infer that McCarty agreed to participate in a jointly undertaken criminal scheme. For example, McCarty participated in the bribery of Philpot. The evidence established that Whitman paid a construction company owned by McCarty to make improvements to Philpot's home. And that bribe was similar to the bribes McCarty received from Whitman, which suggests that McCarty was aware that he was facilitating a bribe.

Throughout the operation of the scheme, Whitman, Philpot, and Potts spoke to each other about the involvement of the other participants, including McCarty. Whitman told Potts that he "had [McCarty] working for him" and that he was "paying him to get [him] as many loads as possible." And Potts was not "surprised" to learn of their relationship. Whitman also complained to Philpot and Potts when he learned that McCarty was giving loads to a competitor. For example, he once rhetorically asked Philpot, "[W]hat am I paying him for[?]" In the light of

this record, the district court could have reasonably found that McCarty participated in similar conversations.

McCarty conferred with Philpot and Potts about the progress of the investigation. After investigators searched the office, Philpot and Potts agreed that "one of [them] needed to call [McCarty]" and "give him a heads up." The three coworkers then met several times to discuss the status of the investigation. At one meeting, McCarty said that "all they had on him was a four-wheeler and a Mustang, and he wasn't going to prison for that."

All three government employees were aware of and facilitated the ongoing criminal conduct of their coworkers. All three employees worked in a small office, enjoyed catered lunches together that were purchased by Whitman, and saw Whitman speaking privately to the other participants when he visited the office. As his supervisor, Philpot also reviewed McCarty's work, identified activity, like short loading, that was similar to his own fraudulent activity, and failed to take any corrective action—even though other employees' work was "for the most part correct." Philpot testified that he "figured [McCarty] was doing pretty much the same thing [he] was doing," and that "[he] did not want to get him in trouble, and [he] didn't want [him]self to get in trouble either." And Whitman once invited both Philpot and McCarty to a bachelor party in Biloxi, Mississippi at Whitman's expense and gave them money to gamble.

17

McCarty contends that there was insufficient evidence to infer an agreement because Whitman approached the employees separately, and they ordinarily did not discuss with each other the specific details of their individual dealings with Whitman. We disagree.

To be sure, Philpot and Potts testified that they never spoke with McCarty about their arrangement with Whitman because they "knew that it was . . . illegal" or "wrong," but an agreement may be "implicit," U.S.S.G. § 1B1.3, cmt. n.3(B), and not every participant in a jointly undertaken criminal scheme must know every detail of the others' participation. It is enough that McCarty was "fully aware of the objective of the [scheme] and was actively involved in [it]." *United States v. McCrimmon*, 362 F.3d 725, 732 (11th Cir. 2004); *see also id.* at 733 ("He was certainly not a low-end operative merely aware that he was participating in some sort of criminal ring—his knowledge and participation far exceeds that description."). The district court did not clearly err when it calculated McCarty's Guidelines range using the total loss caused by the criminal scheme.

## IV. CONCLUSION

We **AFFIRM** Whitman's conviction and McCarty's sentence.