IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| CHRISTOPHER WHITMAN,<br>    Petitioner | )<br>)<br>) |
| v. | )   Criminal Case No.<br>)   1:14-CR-1-1 (WLS)<br>)   28 U.S.C. § 2255 Case No. |
| UNITED STATES OF AMERICA,<br>    Respondent | )   1:19-CV-183 (WLS)<br>)<br>) |

## EXPERT REPORT OF MATTHEW KAISER

I have been retained as an expert witness to provide opinions on certain issues of legal ethics in connection with a petition for post-conviction relief in this case. Each opinion is offered to a reasonable degree of professional certainty.

I adopt and incorporate herein any later testimony that I may hereafter give in this case and ask that this Report be deemed to be supplemented by any such testimony without the need to prepare a Supplemental Report.

**Fact Section**

Christopher Whitman was convicted of bribery and other offenses after a trial. I have reviewed the Presentence Report in his case, and briefly summarize the statement of facts from the Presentence Report here.

Christopher Whitman was the founder, co-owner, and chief operator of United Industrial of Georgia, Inc. (ULOC), and its affiliated entity, ZMK Trucking. Mr. Whitman's companies did business with the United States Marine Corps Logistics Base, at Albany, Georgia. Mr. Whitman's co-defendants, Mitchell Potts, Jeffrey Philpot and Shawn McCarty worked at the Base, in the office that was responsible for hiring trucking companies.

1

Kelli Dunham was an employee of Mr. Whitman's company who reported directly to Mr. Whitman. She was responsible for taking freight orders from the Base. She then either arranged for direct transportation, using ULOC trucks, or brokered the shipments to other private trucking companies. She was also responsible for billing the government and maintaining various records.

As the Presentence Report summarizes the conduct: "Christopher Whitman began doing business with the DLA, specifically the MCLB-Albany, to increase business for his trucking company. He discovered that some of the employees [namely Mitchell Potts, Jeffrey Philpot and Shawn McCarty] there were susceptible to bribery and then took full advantage of the system's weaknesses as it pertained to record keeping, good business practices and fairness."

**Mr. Whitman's Legal Representation**

Mr. Whitman, his wife, and his company were represented by the law firm Thompson & Singer in connection with tax matters related to his criminal investigation. The lawyer at Thompson & Singer who worked on Mr. Whitman's case was Douglas Thompson, an experienced tax attorney.

Mr. Thompson's representation was inexorably intertwined with Mr. Whitman's criminal case. Mr. Whitman was, initially, under investigation for bribery and other related financial crimes. While under investigation he was required to file his tax returns. Ed Garland, Mr. Whitman's criminal defense attorney in the investigation, brought Mr. Thompson into the case to navigate how Mr. Whitman could file his tax returns without making a statement that could be used against him in the criminal investigation.

As a result, Mr. Whitman's lawyers needed to coordinate. Mr. Thompson and Mr. Garland spoke about the case, and as reflected in Mr. Thompson's time records in his invoices, they spoke and met often. They discussed the facts of the criminal case as Mr. Garland – and Mr.

Whitman – understood them. For example, they met for almost two hours on June 14, 2012, then met for more than three hours the next day, June 15th. On July 18, 2012, Mr. Thompson recorded that he attended a client meeting with Mr. Whitman where Mr. Garland made "work product presentations" "in regard to [the] criminal defense representation of [their shared] clients."

Moreover, at some point the IRS began an investigation into Mr. Whitman. Mr. Thompson represented Mr. Whitman in connection with this investigation, and he coordinated closely with Mr. Garland because the issues in the audit necessarily intersected with the issues in the criminal investigation.

In 2012, Mr. Whitman hired Mr. Thompson at Thompson & Singer to represent him in connection with the tax implications of his criminal case. In 2013, Mr. Thompson's partner, Janice Singer, was hired by Kelli Dunham – Mr. Whitman's long-time secretary – to represent her in connection with the criminal case. For approximately six months, Mr. Thompson represented Mr. Whitman, and Ms. Singer represented Ms. Dunham with no sense that there was a conflict of interest between representing two people caught up in the same criminal investigation. Ms. Singer claimed that she was unaware that she was representing Ms. Dunham at the same time that her law partner was representing Mr. Whitman. Singer Affidavit at 3.

In early 2013, Ms. Singer purported to realize, for the first time, that she and her law partner represented separate and, at that time, potentially adverse clients in connection with the same criminal investigation. Ms. Singer wrote a lengthy letter purporting to be a conflict-of-interest waiver. In it, she says, of her representation of Ms. Dunham that she "felt it was a conflict as Mr. Thompson and I are partners." After describing her partner's representation of Mr. Whitman as "separate and apart" from the criminal investigation that she represented Ms.

3

Dunham in, she writes that "it remains our opinion that there is still an inherent, or at a minimum perceived conflict as Mr. Whitman may wish to take a position contrary to Ms. Dunham in regard to the criminal [matter] or vice-versa." Page 2.[1]

Ms. Singer accurately identified the conflict – Ms. Dunham may want to cooperate against Mr. Whitman who is a client of her firm. Ms. Singer purported to cure this conflict in two ways. First, she asked Mr. Whitman and Ms. Dunham to execute a conflict waiver after getting separate counsel. At that time, Ms. Singer knew that Mr. Whitman was represented by Mr. Garland; he would be that separate counsel. Second, Ms. Singer represented that she and Mr. Thompson "agree not to share information from their separate matters."

Mr. Whitman, Ms. Dunham, and Mr. Whitman's wife executed the letter that purported to be a conflict waiver.

Ultimately, Ms. Dunham pled guilty to offenses relating to her time working for Mr. Whitman's company and cooperated against Mr. Whitman, including by testifying against him at his trial. Mr. Whitman was convicted and, later, filed this post-conviction petition.

Beyond these facts, I have been asked to make the following factual assumptions by current counsel for Mr. Whitfield:

(1) After Mr. Whitman initially learned he was under investigation he met with his long-time attorney, Robert Margeson. Margeson and his daughter, who was also an attorney, Leigh Ann Flynn, had handled every aspect of the Whitman's legal life for many years. Their first meeting about the investigation was in April 2012. At that meeting were Chris Whitman, Kelli Dunham, and Robert Margeson. Margeson contacted NCIS about the investigation. Margeson questioned Chris and Kelli on

---

[1] Ms. Dunham's fees for Ms. Singer's representation were paid by Mr. Whitman. This is a potential conflict, but my understanding is that this conflict was appropriately handled.

4

several issues with all three together during the questioning. Chris told Mr. Margeson about Potts and Philpot telling him he had to pay because G&S Trucking, Mercer Transportation, Landstar were paying for hauls. Margeson soon realized that his general practice experience had not prepared him to manage a federal criminal case. He initially consulted with a criminal defense attorney named James Wiggins. When that consultation was not successful, Mr. Margeson contacted Ed Garland.

(2) Mr. Garland traveled to Mr. Margeson's Albany, Georgia office for an initial meeting with Mr. Whitman. Mr. Whitman was impressed with Ed Garland, and it was agreed that he would be hired for a fee of $500,000. Mr. Margeson was to receive 35 percent of Garland's fee, to the tune of $150,000. Mr. Garland subsequently received another $250,000 and then another $100,000 for representing different aspects of the charges, apparently excluding Mr. Margeson from his percentage of the fees, about which Mr. Margeson complained to Mr. Whitman.

(3) The next meeting took place at the Garland Law Building in the metropolitan suburb of Buckhead. Present at the initial Garland Law Building meeting were Mr. Garland, Mr. Margeson, Mr. Singer, Chris Whitman, and Kelli Dunham. Details of the case were discussed, and Mr. Whitman spoke freely about the facts that were relevant to the bribery investigation. At the time of those meetings, Mr. Garland represented Mr. Whitman. Kelli Dunham was not represented. Ms. Singer was introduced to Mr. Whitman as an attorney, but it was not clear why she was in the meetings or what her interests at those meetings were. But Mr. Garland wanted her there, and Mr. Whitman assumed that Mr. Garland knew what he was doing. The next several times Mr. Whitman traveled to Atlanta to meet with Mr. Garland, the same group of people met

5

to discuss Mr. Whitman's case, including Ms. Dunham, Ms. Singer, Mr. Thompson, and others. At times, the group would walk to a restaurant and would continue to discuss the case over lunch. These meetings and lunches started in April or May in Mr. Margeson's offices, then, in May in Mr. Garland's offices.

(4) Ms. Singer claims that it was not until June that she began representing Ms. Dunham. It was at that point that Mr. Garland stopped the meetings with Mr. Whitman, Ms. Dunham, and Ms. Singer. Ms. Dunham met separately.

(5) The facts underlying the investigation and incriminating information were shared by Mr. Whitman at the joint meetings and lunches. In front of Ms. Singer and Ms. Dunham, Mr. Garland had his client discuss equipment purchases and criminal conduct associated with them with Shelby Janes, Brad Newell and C.W. Smith. Ms. Dunham had nothing to do with the equipment in her job at Whitman company owned by Mr. Whitman; she only learned this information from being a participant in these group meetings and lunches. Ms. Dunham also did not know about the scheme to set up Mr. Whitman's rival, Beau Kimsey, for a DUI so he would lose his commercial driver's license; she learned of that from the group meetings. Ms. Dunham, who kept a spread sheet of expenses for Mr. Whitman's company, did not know what those expenses were for – and that they were payments to government officials – until she attended attorney client meetings and Mr. Whitman explained those costs to Mr. Garland, Mr. Singer and Ms. Dunham.

(6) A summary of information Ms. Dunham learned at attorney client meetings she did not learn through her employment with Mr. Whitman is:

6

    a. She learned of a conspiracy between Mr. Mercer and Mr. Whitman; Ms. Dunham did not previously know that Mr. Whitman was engaged in conduct with Mr. Mercer.

    b. That the "costs" on the expense spreadsheets she maintained related to bribes.

    c. That Mr. Whitman had private dealings in selling equipment to Shelby Janes, Brad Newell and C.W. Smith.

    d. That cash envelopes were given to Shawn McCarty, Jeff Philpot, and Mitch Potts.

    e. That Mr. McCarty's construction company did construction work for Mr. Whitman and on Mr. Philpot's house.

    f. That Mr. Whitman bought coins for Mr. Philpot as a way of making a bribe.

    g. That Mr. Whitman paid for a Mr. Philpot and Shawn McCarty to attend Zach Whitman's bachelor party in Biloxi.

    h. That Mr. Whitman, and others, set up Bo Kinsey – a rival to Mr. Whitman's business, for a DUI so that he would lose his commercial driver's license.

    i. That Mercer sent Mitch Potts on a cruise for his wedding.

    j. That Mercer sent Mitch Potts on a hunting trip.

(7) Had Ms. Dunham not attended the meetings in Mr. Garland's office where Mr. Whitman shared information with Mr. Garland for his criminal case, Ms. Dunham would not have had any of this information. As a direct result of Mr. Garland's decision to allow her attendance at those meetings, Ms. Dunham was able to share this information with the government to be used against Mr. Whitman.

(8) At all times relevant to this discussion, Thompson & Singer rented space from Mr. Garland in the Garland Law Building. Thompson & Singer was on the second floor. Mr. Garland's office was on the first floor. Prior to her involvement in the Whitman case Ms. Singer worked for Mr. Garland. The office address is 3151 Maple Drive, Atlanta Georgia. Mr. Garland referred the representation of Mr. Whitman to Mr. Thompson and he referred the representation of Ms. Dunham to Ms. Singer.

(9) Janna Harris, a lawyer in Mr. Garland's firm, also represented Zach Whitman, Brian Whitman, Meghan Whitman, and Earl Varnadoe when they received grand jury subpoenas to testify in the investigation into Chris Whitman, despite that Mr. Garland was already representing Chris Whitman.

**Legal Opinions**

I have formed four opinions relevant to this case.

**Opinion 1: There was an Unwaivable Conflict between Ms. Dunham and Mr. Whitman**

Ms. Singer accurately recognized that there was a conflict of interest between her firm's representation of Ms. Dunham and her firm's representation of Mr. Whitman. However, this conflict of interest was not waivable.

Georgia Rule of Professional Conduct 1.7(a) is clear: "A lawyer shall not represent or continue to represent a client if there is a significant risk that the . . . lawyer's duties to another client . . . will materially and adversely affect the representation of the client, except as permitted in (b)."

Rule 1.7(b) permits a representation prohibited by subsection (a) if the client gives informed consent. However, 1.7(c) says that:

> "Client informed consent is not permissible if the representation:

1. . . . ;
2. includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or
3. involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients."

Here, both 1.7(c)(2) and (c)(3) are met. Rule 1.7(c)(2) is met because the matters are substantially related – Mr. Thompson's representation of Mr. Whitman was a part of Mr. Garland's representation of Mr. Whitman in his criminal case and necessarily involved the same nucleus of facts as the criminal case that Ms. Singer represented Ms. Dunham in. And Ms. Dunham's position was that Mr. Whitman had committed a crime. Mr. Whitman's position was that he hadn't. It is difficult to imagine a starker difference in position.

As discussed below, because Mr. Garland arranged for Mr. Thompson and Ms. Singer to represent Mr. Whitman and Ms. Dunham—in essence, asking two partners at one firm to take on impermissibly conflicted representations—he is the architect of this unwaivable conflict of interest.

Rule 1.7(c)(3) is also met. No reasonable lawyer would think that Thompson & Singer could represent both a cooperating witness against a person and the person himself. Comment 8 to Rule 1.7(c)(3) states the general rule: "Ordinarily, a lawyer may not act as advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated."

As a result, Mr. Whitman and Ms. Dunham could not give informed consent to the waiver of the conflict of interest that Ms. Singer sought. Because they could not provide informed consent to the joint representation, the conflict waiver that Ms. Singer sought was not effective.

9

**Opinion 2: The Conflict Is Imputed to the Entire Firm**

The unwaivable conflict of interest between Mr. Whitman and Ms. Dunham applies to the entire firm of Thompson & Singer, not merely to each lawyer separately.

Ms. Singer's attempt to assert that the conflict of interest applied to her alone, and not to her firm is not consistent with the Georgia Rules of Professional Conduct. Rule 1.10(a) is clear: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7: Conflict of Interest . . ." As is discussed above, the conflict of interest here arises out of Rule 1.7; the conflict is a conflict for the entire firm, not merely the individual lawyers alone. Comment 6 to the Rule puts it well: "a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client."

Ms. Singer asserts that she and Mr. Thompson were not "traditional partners." Affidavit at 5. It is not clear what that means. What is clear, from their letterhead, their shared office space, and their shared firm name, is that they held themselves out to the public as a law firm. Comment 1 to Rule 1.10 squarely addresses – and rejects – Ms. Singer's view that because they were not a "traditional" law partnership there was no conflict: "two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for the purposes of the rules."

Thus, because Thompson & Singer held itself out to the world as a law firm, the conflict of interest applied to each lawyer in the firm.

**Opinion 3: If Mr. Garland Shared Mr. Whitman's Client Confidences with Ms. Singer, that Violated a Number of Duties**

For this opinion, I have been asked to assume that when Mr. Whitman drove to Atlanta to meet with Mr. Garland, he brought Ms. Dunham with him. I have been asked to further assume that Mr. Garland would invite Ms. Singer, and others, into meetings with Mr. Whitman and Ms. Dunham where he would discuss Mr. Whitman's criminal case. Further, Mr. Whitman would speak at these meetings and provide information that would be privileged, was incriminating, and allowed Mr. Dunham to have access to additional information that she ultimately shared with the government. The information that was provided at these meetings is set out in the statement of factual assumptions above.

If true, this would be a serious breach of Mr. Garland's duty to safeguard Mr. Whitman's client confidences and his duty to provide competent representation to Mr. Whitman. A competent lawyer would know not to discuss attorney client confidences and attorney work product in front of a third person – be it another lawyer or a witness in the case. A lawyer engaging in such conduct violates Rule 1.1's duty of confidence as well as Rule 1.6's duty to keep confidential and secret information confidential and secret.

**Opinion 4: If Mr. Garland Permitted His Client to Share Would-Be Confidential Information with Others, He Faced a Personal Interest Conflict When He Advised Mr. Whitman to Sign Ms. Singer's Conflict Waiver**

The entanglements between Mr. Garland, Mr. Thompson, and Ms. Singer created a conflict of interest for Mr. Garland as well.

Mr. Garland referred Mr. Whitman to Mr. Thompson as a client. Mr. Garland knew that Mr. Thompson was at a law firm with Ms. Singer; they were tenants in the office building Mr. Garland owned. Mr. Garland also invited Ms. Singer – and Ms. Dunham – to sit in meetings with him and his client as they discussed the case.

11

When Ms. Singer wrote the letter that purported to be a conflict waiver letter, described and discussed above, Mr. Garland should have advised his client not to sign the document. That conflict waiver letter allowed Ms. Singer – who now had Mr. Whitman's confidential information – to represent Ms. Dunham as she took that confidential information to the government to be used against Mr. Whitman.

Georgia Rule 1.7 makes it clear that a conflict of interest emerges if "lawyer's own interests" would conflict with a client's interests. Rule 1.7(a). As Comment 6 says, "[i]f the propriety of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client objective advice."

Here, Mr. Garland's conduct was improper. He intentionally and knowingly discussed client confidences in front of Ms. Singer and Ms. Dunham, which is a violation of his duties to safeguard Mr. Whitman's secrets and a violation of his duty to provide competent representation to Mr. Whitman. Mr. Garland encouraged his client to share confidential information about his case with others. Through those meetings, a woman who was not his client gained substantial knowledge about the case that was then used against Mr. Whitman when she was a cooperating witness.

Because Mr. Garland violated his duties to Mr. Whitman by permitting others to be at the meetings he had with Mr. Whitman, when he advised Mr. Whitman about whether to execute the conflict of interest letter he was laboring under a conflict between keeping it from being clear to Mr. Whitman how very bad his judgment was to have Ms. Singer and Ms. Dunham at the meetings and his duty to Mr. Whitman to advise him not to waive the conflict.

Moreover, my understanding is that Mr. Garland referred Ms. Dunham to Ms. Singer as counsel. Because Ms. Singer was a participant in what should have been privileged

12

conversations between Mr. Garland and Mr. Whitman, Mr. Garland should not have made such a referral.

### Conclusion

Thus, in sum, the conflict between Ms. Dunham and Mr. Whitman was not waivable. And it applied to every lawyer at Thompson & Singer, not the individual lawyers individually. Ms. Singer's attempt to have Mr. Whitman waive this conflict were flawed as a matter of law.

Moreover, Mr. Garland violated Rules 1.1, 1.6, and 1.7, by allowing others to be present at meetings with his client where privileged information was discussed and, then, by failing to object to a conflict of interest waiver that allowed another lawyer who had confidential information to represent a cooperating witness against Mr. Whitman.

### Materials Reviewed

- Criminal Jury Trial Transcripts, Volumes 1-23, January 29, 2015 through March 4, 2015
- Sentencing Hearing, September 10, 2015
- Amendment to Sentencing, September 17, 2015
- U.S.S.G Amendment 791 Effective November 1, 2015, Reducing Guideline Sentence for Loss Amount
- Douglas R. Thompson letter to Whitmans' referencing "WE" discussed with Garland
- Thompson Singer Billing Records, 2013 Payee Ron Thompson; 2014 payee to be Thompson Singer
- Janice Singer Letters
- Janice Singer affidavit with attachments
- Keli Dunham Plea Agreement
- Keli Dunham Docket Sheet
- U.S. Naval Criminal Investigative Services, Results of Interviews.
- December 11, 2020 Letter from Janice Singer-Capek to Christopher Whitman
- Thompson & Singer, P.A. Payment Documentation
- Presentence Investigation Report, September 4, 2015
- Addendum to the Presentence Report, September 4, 2015

### Prior Expert Testimony

I have previously provided a copy of my C.V. to counsel for Mr. Whitman.

I have previously been qualified as an expert witness and provided testimony in: *Amell et al. v. Bertram*, Civil Case No. 2018 CA 000688 B in the Superior Court of the District of Columbia; *Miriam, Inc., et al. v. Universal Underwriters Insurance Company*, PJM 17-3021 in the United States District Court for the District of Maryland.

I have previously identified as an expert witness and/or provided an expert report in: *United States v. Brandon Laureys*, RCL 09-106 in the United States District Court for the District of Columbia; *Taylor v. Liptz*, Case No. 2018 CA 4406 in the Superior Court for the District of Columbia, *Settlement Corp. v. Gidney*, Case No. 2019 CA 4678 in the Superior Court for the District of Columbia.

**Certification**

I certify that this report is a complete and accurate statement of my opinions, and the basis for them, to which I will testify under oath.

Matthew G. Kaiser

# Matthew G. Kaiser

1099 14th Street NW, 8th Floor West, Washington, DC 20005 • (202) 640-2850 • mkaiser@kaiserdillon.com

## Professional Experience

**KAISERDILLON PLLC** — Washington, D.C.
*Managing Partner* — *June 2009 – Present*

**GEORGETOWN UNIVERSITY LAW CENTER** — Washington, D.C.
*Adjunct Professor of Law – Professional Responsibility* — *2013 – 2020*

**ZUCKERMAN SPAEDER LLP** — Washington, D.C.
*Associate* — *December 2007 - May 2009*

**OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF MARYLAND** — Greenbelt, MD
*Assistant Federal Public Defender* — *January 2005 - December 2007*

**WILLIAMS & CONNOLLY LLP** — Washington, D.C.
*Associate* — *September 2003 - November 2004*

**UNITED STATES DISTRICT JUDGE CATHERINE C. BLAKE** — Baltimore, MD
*Law Clerk* — *September 2002 - August 2003*

## Community Involvement

**BOARD ON PROFESSIONAL RESPONSIBILITY** — Washington, DC
*Chair* — *August 2019 – Present*
*Vice-Chair* — *August 2017 – July 2019*
*Board Member* — *August 2016 - Present*

**HEARING COMMITTEE OF THE BOARD ON PROFESSIONAL RESPONSIBILITY** — Washington, DC
*Chair of Hearing Committee 1, Committee Member* — *April 2011 - Present*

**AMERICAN BAR ASSOCIATION, STANDING COMMITTEE ON THE FEDERAL JUDICIARY**
*D.C. Circuit Representative* — *January 2019 – August 2020*

**INTERNATIONAL BAR ASSOCIATION, CRIMINAL LAW COMMITTEE**
*Committee Member, Judicial Integrity Project Liaison* — *October 2018-Present*

**BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA** — Washington, DC
*President* — *June 2017 – June 2018*
*President-Elect* — *June 2016 - June 2017*
*Treasurer* — *June 2015 - June 2016*
*Member of the Board of Directors* — *June 2011 – June 2019*

**D.C. BAR** — Washington, DC
*Secretary, Member of the Board of Governors* — *July 2014 - July 2015*

**D.C. BAR, PRACTICE MANAGEMENT SERVICE COMMITTEE** — Washington, DC
*Chair, Vice-Chair, Committee Member* — *November 2012 - November 2017*

**JUDICIAL CONFERENCE OF THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT** — Washington, DC
*Permanent Member* — *June 2009 - Present*

**EDWARD BENNETT WILLIAMS AMERICAN INN OF COURT** — Washington, DC
*Member* — *September 2008 - Present*

## Representative Speaking Engagements

ABA Administrative Law Conference, *Ethics Essentials: How to Avoid Problems and Pitfalls,* November 1, 2018

International Bar Association, *Lawyers versus Machines: How to Understand Artificial Intelligence,* October 11, 2018

Association of Professional Responsibility Lawyers, *Ethics in the Headlines,* August 2, 2018

DC Bar CLE, *Ethics and Criminal Defense*; September 18, 2018 and December 19, 2016

Federal Communications Bar Association, *The Ethics of Lobbying,* April 5, 2018

## Bar Memberships

Maryland, District of Columbia
United States District Court for the District of Maryland, United States District Court for the District of Columbia
United States Courts of Appeals for the Third, Fourth, Sixth, and Seventh Circuits, and the D.C. Circuit
United States Supreme Court

## Education

**GEORGETOWN UNIVERSITY LAW CENTER** — J.D., May 2002
   *Honors*:   *Magna cum laude,* Order of the Coif, selected into the Appellate Litigation Clinic
   *Journal*:   Senior Articles Editor, Volume 90 of THE GEORGETOWN LAW JOURNAL

**TULANE UNIVERSITY** — M.A. Philosophy, May 1996

**THE COLLEGE OF WOOSTER** — B.A. Philosophy, May 1994